JMS:JPM/DEL
F. #2020R00637

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      Docket No. 21-CR-466 (ARR)

ANDREW RUSSO, et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR PERMANENT ORDERS OF DETENTION


JACQUELYN M. KASULIS
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


James P. McDonald
Devon Lash
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

I.   Overview of the Investigation ....................................................................................... 4

II.  The Racketeering Defendants ...................................................................................... 5

III. Charged Conduct .......................................................................................................... 6

    A.  The Labor Racketeering Scheme ............................................................................ 6

    B.  Repeated Threats of Violence ............................................................................... 13

    C.  The Loansharking Scheme .................................................................................... 15

    D.  The Fraudulent Safety Scheme ............................................................................. 16

    E.  Drug Trafficking .................................................................................................... 17

    F.  Uncharged Violence Acts and Threats ................................................................. 18

DISCUSSION ...................................................................................................................... 20

I.   Legal Standard ............................................................................................................ 20

    A.  Bail Reform Act ..................................................................................................... 20

    B.  The Racketeering Defendants ............................................................................... 21

        1.  Leaders of a Violent Criminal Enterprise Are Dangerous Due to Their
            Position of Authority in That Enterprise ................................................................ 22

        2.  The Racketeering Defendants Are Likely to Commit Crimes if Released
            on Bail ..................................................................................................................... 25

        3.  Elaborate Bail Packages Are Insufficient to Protect the Community Against
            Violent Racketeering Defendants ......................................................................... 26

II.  The Racketeering Defendants Should Be Detained ....................................................... 28

    A.  The Racketeering Defendants Are a Danger to the Community ............................... 28

        1.  Nature and Circumstances ...................................................................................... 29

        2.  History and Characteristics of the Racketeering Defendants ................................... 32

      a.   Andrew Russo ............................................................................. 32

      b.   Benjamin Castellazzo ................................................................. 33

      c.   Thomas Costa .............................................................................. 35

      d.   Ralph DiMatteo ........................................................................... 36

      e.   Richard Ferrara .......................................................................... 37

      f.   Theodore Persico, Jr. ................................................................. 38

      g.   John Ragano ................................................................................. 39

      h.   Domenick Ricciardo ................................................................... 41

      i.   Vincent Ricciardo ....................................................................... 42

      j.   Michael Uvino ............................................................................. 43

  3.  Seriousness of the Danger Posed by the Defendants' Release ............................ 44

  4.  Evidence of the Defendants' Guilt ..................................................... 44

B.  The Racketeering Defendants Constitute Risk of Flight ............................................ 45

CONCLUSION .............................................................................................. 46

## PRELIMINARY STATEMENT

The government hereby moves for permanent orders of detention with respect to the following defendants, each of whom is a member or associate of the Colombo organized crime family of La Cosa Nostra (the "Colombo crime family"): Andrew Russo, Benjamin Castellazzo, Thomas Costa, Ralph DiMatteo, Richard Ferrara, Theodore Persico, Jr., Domenick Ricciardo, Vincent Ricciardo and Michael Uvino (collectively, the "Racketeering Defendants").  The government also seeks detention for John Ragano, who is a solider in the Bonanno crime family of La Cosa Nostra (the "Bonanno crime family").

On September 8, 2021, a grand jury in this district returned a 19-count indictment (the "Indictment") charging fourteen defendants, including eleven members and associates of the Colombo crime family with labor racketeering, extortion, money laundering conspiracy and other offenses.  This memorandum is submitted in support of the government's application for detention of the Racketeering Defendants and Ragano, all members or associates of violent organized criminal groups who pose a danger to the community, witnesses and victims, as well as a flight risk.[1]  The charges, many of which constitute crimes of violence under the Bail Reform Act,[2] and have involved repeated threats

_____

[1]     The government makes this motion without prejudice to making additional arguments in support of detention of any of the Racketeering Defendants, and without prejudice to seeking a permanent order of detention against other defendants indicted in this or related matters.

[2]     A compelling factor favoring detention is the charged crimes' status as crimes of violence under 18 U.S.C. § 3156(a).  Section 3156(a)(4) defines the term "crime of violence" to include, inter alia: "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and "any other offense that is a felony and that, by its nature, involves a substantial risk that

and uses of violence against victims, and implicate the entire leadership structure of the Colombo crime family, including boss Andrew "Mush" Russo, underboss Benjamin "Benji" Castellazzo and consigliere Ralph DiMatteo.  The evidence against each of the Racketeering Defendants and Ragano is overwhelming and includes, <u>inter</u> <u>alia</u>, thousands of hours of judicially authorized wire intercepts and consensual recordings, witness testimony, physical surveillance and documentary evidence.

For the reasons set forth below, the Court should enter permanent orders of detention.

---

physical force against the person or property of another may be used in the course of committing the offense."

## BACKGROUND

The government proffers the following facts concerning the charges at issue and pretrial detention.[3]  See United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).[4]

The proffer includes a brief description of the following: (1) the government's investigation of the Colombo crime family and the Racketeering Defendants and Ragano; (2) the Racketeering Defendants' association with and positions in the Colombo crime family; (3) the Racketeering Defendants' and Ragano's involvement in the charged criminal activity and other criminal offenses.

---

[3]     The proffer of facts set forth does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

[4]     As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

I.      Overview of the Investigation

Approximately one year ago, law enforcement agents received information that multiple members of the Colombo crime family were extorting a senior official of a Queens, New York based labor union (the "Labor Union").  The government's investigation has identified that the senior official, who is named as "John Doe #1" in the Indictment, was one of several individuals associated with the Labor Union or its employee welfare benefit fund (the "Health Fund") who have received threats, pressure and demands from the Racketeering Defendants.

Between August 2020 and March 2021, the government intercepted telephone communications, pursuant to judicially authorized wiretaps, for telephones used by Racketeering Defendants DiMatteo, Persico, Ferrara, Vincent Ricciardo, Uvino and Domenick Ricciardo.[5]  The interceptions revealed, among other things, that the senior leadership of the Colombo crime family, including boss Andrew Russo was intimately involved in directing the extortion of the Labor Union, Health Fund and their employees and consultants.

During the investigation, law enforcement officers further learned that Racketeering Defendants Vincent Ricciardo, Uvino, and Costa, together with Bonanno family soldier Ragano, were involved in loansharking.  Additionally, Vincent Ricciardo, Costa, and Ragano, along with co-defendants, have been involved in arranging to transport

---

[5]      The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap and oral interceptions at the detention hearing in this case.  In order to preserve the integrity and confidentiality of the government's investigation, notice to the defendants of the interceptions prior to their arrest was not feasible.

large quantities of marijuana along the East Coast.  Racketeering Defendant Persico, who was released from federal prison in 2020, and is presently on supervised release with a condition to not associate with members of organized crime, has directed much of the Labor Racketeering scheme and met regularly with numerous members of the Colombo crime family.

The Indictment is the most recent result of a long-term investigation by this Office, the Federal Bureau of Investigation and other law enforcement agencies into the ongoing criminal activities of the Colombo family.  The present charges are the product of the government's use of a diverse array of investigative tools, including thousands of hours of wiretap interceptions and consensual recordings by a confidential witness in which many defendants discuss a variety of criminal activities.  Notably, these recordings unequivocally make clear that the Colombo crime family is thriving and continues to engage in various crimes including, among others, extortion, loansharking, money laundering, fraud and drug trafficking.

II.    The Racketeering Defendants

The government will establish the Racketeering Defendants' positions within the Colombo family and La Cosa Nostra ("LCN") through wiretap intercepts, consensual recordings, the testimony of cooperating witnesses, as well as surveillance evidence and physical evidence.  As alleged in the Indictment, Andrew Russo is the official boss of the Colombo crime family; Benjamin Castellazzo is the underboss of the Colombo crime family; Ralph DiMatteo is the consigliere of the Colombo crime family; Theodore Persico, Jr. is a captain within the Colombo crime family who the investigation has shown will assume the role of boss after Russo; Vincent Ricciardo and Richard Ferrara are captains within the

Colombo crime family; and Michael Uvino is a solider.  Thomas Costa and Domenick Ricciardo are associates within the Colombo crime family.  Defendant John Ragano, who is not charged with racketeering but who committed multiple offenses with Colombo family members Vincent Ricciardo and Uvino and associate Domenick Ricciardo, is a solider within the Bonanno crime family.  During the investigation, multiple members of the Colombo crime family have been recorded describing the roles of each of Russo, Castellazzo, DiMatteo, Persico, and Vincent Riccciardo; including describing Russo as "boss," Castellazzo as "underboss" and "number two," and DiMatteo as "number three."

III.    Charged Conduct

      A.    The Labor Racketeering Scheme

      The government's investigation has shown that the Colombo family's extortion of the Labor Union has occurred for the better of 20 years.  In or about 2001, the defendant Vincent Ricciardo began demanding and receiving a portion of the salary of John Doe #1, a senior official at the Labor Union.  Vincent Ricciardo has falsely claimed that these payments were a "pension" for himself from the Labor Union.  In the mid-2000s, when Vincent Ricciardo was convicted in this District for racketeering related to the extortion other labor unions, see Docket No. 03-CR-191 (SJ), and sentenced to federal prison, Vincent Ricciardo's cousin Domenick Ricciardo began collecting the payments on Vincent Ricciardo's behalf.

      The collection of these payments from Labor Union personnel, including from John Doe #1, has involved repeated threats of violence by Colombo family captain Vincent Ricciardo, a soldier in his crew Michael Uvino, and associate Domenick Ricciardo.  For example, both Vincent Ricciardo and Uvino traveled at night to John Doe #1's home in

January 2020 to threaten him and his family.  In the months that followed, Domeinck

Ricciardo sent John Doe #1 threatening text messages.  In September 2020, both Vincent

Ricciardo and Uvino went to the union's office in Queens and attempted to confront

employees there, banging repeatedly on a locked door apparently attempting to enter.  When

the police were summoned to the office and stopped Vincent Ricciardo and Uvino driving

away, they told police officers they were attempting to collect a check.  And, just over two

months ago, in June 2021, Vincent Ricciardo explicitly threatened to kill John Doe #1 were

he not to comply with Vincent Ricciardo's demands involving the Labor Union.  He

explained that John Doe #1:

> knows I'll put him in the ground right in front of his wife and
> kids, right in front of his fucking house, you laugh all you want
> pal, I'm not afraid to go to jail, let me tell you something, to prove
> a point? I would fucking shoot him right in front of his wife and
> kids, call the police, fuck it, let me go, how long you think I'm
> gonna last anyway?

In late 2019, the senior administration of the Colombo family became directly

involved in the extortion plan.  Since that time, each of Racketeering Defendants Russo,

Castellazzo, DiMatteo, Persico, and Ferrara have been involved in directly overseeing

Vincent Ricciardo's handling of the matter.  The investigation revealed that the collection of

salary payments from Labor Union personnel was only one facet of a broader plan to take

total control of the Labor Union and more lucrative Health Fund.  This broader plan included

forcing John Doe #1 and others at the Labor Union and Health Fund to make decisions that

benefitted the Colombo crime family, including to select vendors for contracts who were

associated with the Colombo crime family.  The efforts were aimed at generating a $10,000

or greater monthly kickback to the administration of the Colombo crime family from the

Health Fund's asset.  To carry out the extortion, the defendants have also targeted employees of the Labor Union and Health Fund, as well as a Health Fund consultant.

The extortion has been overseen by various senior members of the Colombo crime family at different points in time.  Based on early wiretap interceptions by the government, among other evidence, from at least September 2020 until approximately November 2020, consigliere DiMatteo oversaw the infiltration of the Labor Union and Health Fund, speaking and meeting regularly with Vincent Ricciardo about the crime.  In mid-October, while Vincent Ricciardo met with DiMatteo, they placed a call to a telephone used by Russo (RD #758).  While the telephone was ringing, and in the background, DiMatteo and Ricciardo can be heard talking with one another about how to pressure one of the consultants to the Health Fund who held valuable contracts that the administration was looking to re-bid and collect money from.  During this conversation, Vincent Ricciardo told DiMatteo: "I got every-, I got where he lives, his social security number.  He lives in his house, his wife's social security number.  Big house."  Thus, Vincent Ricciardo appeared to have done research on the consultant in order to be able to go physically threaten him or his family, similarly to John Doe #1.  When Russo came on to the phone, DiMatteo told him, "Monday, nobody's around" and then said, "I'm probably gonna take a ride with him anyway . . . . Just to see, just to see what's going on."  After Russo responded in Italian, DiMatteo said, "I don't know yet.  We're gonna go over it now," which was a reference to DiMatteo and Vincent Ricciardo discussing the Labor Union and Health Fund.

In early November 2020, when John Doe #1 had not yet agreed to meet with Vincent Ricciardo, Vincent Ricciardo explained in calls with Uvino (VR # 1589/1590/1594) and DiMateo that John Doe #1 was refusing to speak with him.  When John Doe #1 and

Vincent Ricciardo did meet, on November 5, 2020, Vincent Ricciardo delivered a series of demands to John Doe #1, including demands that John Doe #1 hire a new consultant selected by the Colombo crime family, that no raises be given to union employees and that the Colombo crime family be given control over the process to contract with vendors.  During the conversation, which was audio-recorded, Vincent Ricciardo stated to John Doe #1, "They were told . . . it's my union and that's it, but I call the shots, nobody listens to me they're out of there.  And like I said, UI [John Doe #1's first name], I don't want to see you . . . go, I just want things to go the way I tell them to go."  With respect to the consultant, Vincent Ricciardo stated: "I'm gonna put an assistant administrator in there with youse, a legitimate guy.  Youse are gona have a trustee meeting, youse are gonna hire him as an assistant administrator, whatever the fuck you do, and he's gona call all the shots, he wants to see the contracts, the payrolls, he wants to sit down, [UI] check to pay him . . . ."  Following the meeting, Vincent Ricciardo and DiMatteo spoke:

| | | |
|---|---|---|
| V. RICCIARDO: | What's up buddy? | |
| DIMATTEO: | What's up? | |
| V. RICCIARDO: | Ahh I, I just had lunch with somebody. | |
| DIMATTEO: | Oh ok. | |
| V. RICCIARDO: | Could I have, could I catch up with you tomorrow somewhere? | |
| DIMATTEO: | Yes. | |
| V. RICCIARDO: | Uhh, the garage? | |
| DIMATTEO: | He met, he met you? | |
| V. RICCIARDO: | Yeah, finally he came to his senses and met me, yeah. | |

DIMATTEO:          Alright I uhh, yeah I'll talk to ya tomorrow. I'll call you in the morning.

In mid-November 2020, the Colombo family leadership met at a restaurant in Brooklyn.  Law enforcement officers surveilling the meeting observed Racketeering Defendants Russo, Castellazzo, DiMatteo, Ferrara and Vincent Ricciardo attending the meeting.  During the meeting, it was decided that Russo would continue to serve as family boss and that Persico would take over the leadership after Russo and upon his completion of federal supervised release.  During the meeting, the extortion of the Labor Union and Health Fund was discussed by Colombo's administration, with the decision that at least $10,000 per month from the Labor Union or Health Fund would need to be kicked up to senior leadership.  At this time,  Ferrara was put in charge of supervising the scheme.

Thereafter, wiretap interceptions and surveillance confirmed that Ferrara, along with DiMatteo, played an active role in overseeing Vincent Ricciardo's efforts.  In mid-November, a consultant selected by Colombo crime family submitted an application to the Health Fund to be hired, and eventually was.  Another meeting between senior Colombo family members was held on November 19, 2020, at the same Brooklyn restaurant.  Based on cell-site location information, wiretap interceptions, license plate readers and physical surveillance, the investigation determined that Persico, Castellazzo, DiMatteo, Ferrara, and Vincent Ricciardo attended, among others.  Following the meeting, at 4:30 p.m. (MU #21684), Vincent Ricciardo called Uvino and told him he was "just leaving Brooklyn" and that "[t]hey were all there."

Thereafter, Vincent Ricciardo spoke regularly with Ferrara about the plans; the investigation showed that Ferrara supervised the matter until late March 2021.  For example,

on November 16, 2021, at approximately 2:25 p.m. in an intercepted call, Vincent Ricciardo and Ferrara discussed Ricciardo having another meeting with John Doe #1.  Vincent Ricciardo noted to Ferrara, "I'll keep youse informed as I get the calls, okay?"  Ferrara later responded, in reference to the senior administration of the crime family, "Yeah because they're, they're hot and heavy on this."

Intercepted telephone calls in January 2021 demonstrate that the senior administration of the crime family was displeased at Vincent Ricciardo's failure to infiltrate the Labor Union and Health Fund more quickly.  For instance, on January 28, 2021, at approximately 12:49 p.m., the following telephone call between Vincent Ricciardo (who was in North Carolina at the time) and DiMatteo was intercepted:

| | |
|---|---|
| DIMATTEO: | When are you coming here. |
| V. RICCIARDO: | I'm coming here in the middle of March. |
| DIMATTEO: | Middle of March, we're gonna wait a month and a half? |
| V. RICCIARDO: | Well things are going slow but they they they I'm not all the way in there yet. |
| DIMATTEO: | Okay, that's no good buddy, you're gonna have to take a trip in, to say hello. |
| V. RICCIARDO: | Alright uh- |
| DIMATTEO: | Everything you. everything you said what's happening? Nothing is happening? |
| V. RICCIARDO: | Of course not, it's going slow, but we're, we're partly in there. |
| DIMATTEO: | You're what? |
| V. RICCIARDO: | We're partly in there. |
| DIMATTEO: | Partly? |

V. RICCIARDO:      Yes.

       . . .

DIMATTEO:      You know everything was left in your hands.

V. RICCIARDO:      And I'm taking care of it little by little.

DIMATTEO:      Okay that's what you wanted, correct? You want it to be in your hands?

V. RICCIARDO:      Yes.

By April 2021, with the extortion effort not proceeding as quickly as the administration had ordered, the Colombo family placed underboss Castellazzo in charge of the matter. This was confirmed by Vincent Ricciardo after a meeting at a garage in the Gravesend section of Brooklyn on April 13, 2021, when Vincent Ricciardo was recorded explaining that Castellazzo (whom Ricciardo referred to as "Benji" the family's "underboss") was in charge of the Colombo crime family's takeover of the Labor Union and the Health Fund. On April 20 and April 28, 2021, law enforcement officers surveilled Vincent Ricciardo meeting with Castellazzo in Brooklyn in order to receive reports from Vincent Ricciardo about the scheme.

In July 2021, while Vincent Ricciardo was in North Carolina, Uvino met with both Russo and Perisco about the plan to divert money from the Health Fund. As captured in a recording from July 20, 2021, Uvino recounted a meeting he had just had with Russo:

UVINO:      I saw, I saw the old man the other day-

CC-1:      You saw which old man?

UVINO:      Andrew-

CC-1:      Oh Andrew.

| UVINO: | So, I told him, I said, you know everything's going smooth . . . |

Later during the conversation, Uvino explained that when Persico took over control of the crime family, Vincent Ricciardo, he and others in Vincent Ricciardo's crew would have an easier time in handling the Labor Union and Health Fund:

| CC-1: | That upstairs is not gonna try to change things on him? You know, they've done it before, where they tell him to back off, do this, don't do this. |
| UVINO: | Listen it's too far gone now. |
| CC-1: | Yea, and I said to him, what protection do we have if the other guy takes over? |
| UVINO: | Listen once they see, once they see money, they'll be fine. Who Teddy? |
| CC-1: | Yea. |
| UVINO: | Listen, when he takes? It's smooth sailing, I was out, he came out with me the other night, we went out to Body English together, forget it, the guy's the best, fucking, I was talking, the guy is the best guy in the world to deal with . . . |

Uvino thus confirmed he had had met with Persico (who is prohibited from meeting with Uvino as a term of his supervised release) and believed that Persico would be very supportive of Uvino and others operation of the Labor Union and Health Fund.

B.    Repeated Threats of Violence

Throughout the investigation, the threat and use of violence by the Racketeering Defendants has been employed. For instance, on May 5, 2021, in describing the extortion scheme, Vincent Ricciardo stated, "I grabbed [John Doe #1's first name] and told him, you got to see him because he is with me. Otherwise I go to his house I break his

head. So anyway, he comes and he meets me.  He is deadly afraid.  He wants to meet me in restaurant.  He is afraid but I told him.  The restaurant ain't going to help.  If I am going to kill you, you would have been dead already."

In another example, on May 20, 2021, Vincent Ricciardo stated in reference to John Doe #1, "I'll send someone to his fucking house, I don't give a fuck.  I'm telling you they are doing something and they are buying time, time and time. Fucking tired of repeating myself I really am."  A short time later, Vincent Ricciardo added, again in reference to John Doe #1, "[w]e will go to his house and break his fucking head."  When Racketeering Defendant Thomas Costa asked if Ricciardo was worried John Doe #1 would cooperate with law enforcement ("you're not worried this kid could be a rat?"), Vincent Ricciardo replied, "He is a rat anyway.  We will send people he don't know [UI] right to his fucking house."

Once again, on June 18, 2021, in reference to John Doe #1, Vincent Ricciardo indicated he would resort to violence if his demands were not met, stating, "you're gonna have to be a little more demanding with this kid, if this kid gets out of hand you gotta tell us then we're gonna have to go smack this kid in his head, I don't give a fuck."

Several days later, on June 21, 2021, Vincent Ricciardo explicitly threatened to kill John Doe #1 were he not to comply with Vincent Ricciardo's demands.  He explained that John Doe #1:

> knows I'll put him in the ground right in front of his wife and kids, right in front of his fucking house, you laugh all you want pal, I'm not afraid to go to jail, let me tell you something, to prove a point? I would fucking shoot him right in front of his wife and kids, call the police, fuck it, let me go, how long you think I'm gonna last anyway?

Furthermore, Vincent Ricciardo has also indicated he and other members of the Colombo crime family have the ability to carry out these threats.  On April 22, 2021, while discussing John Doe #1 with co-conspirators, Vincent Ricciardo noted that "[y]ou go right past his house you'll see his truck there, either it's there or not there."  Vincent Ricciardo clarified that he indeed meant John Doe #1's home, explaining it was located near Ricciardo's own house.  Throughout the scheme, Vincent Ricciardo demonstrated that, as a captain, he could enlist other inducted LCN members and associates to carry out his criminal directives.  In mid-October 2020, Vincent Ricciardo called Uvino and others to assemble a group to go confront another member of the Colombo crime family who had angered Ricciardo.  When contacting associates to join the group, Vincent Ricciardo queried: "[I]s he ok in battle?"

Further, the investigation showed that Vincent Ricciardo and associate Costa also have access to firearms and ammunition.  As reflected in the Indictment, both are charged in connection with procuring ammunition in April 2021 and transporting it to a third-party in upstate New York.  Vincent Ricciardo also made repeated references during intercepted telephone calls to purchasing ammunition and using firearms while in upstate New York.

C.     The Loansharking Scheme

The investigation also revealed that the Racketeering Defendants Vincent Ricciardo, Uvino and Costa, along with Bonanno solider John Ragano, engaged in loansharking.  In October 2020, according to banking records and wire interceptions, Uvino loaned $100,000 to John Doe #2, which John Doe #2 had been storing in a family member's bank account.  John Doe #2 was required to make payments on a weekly basis to Uvino and

Vincent Ricciardo, which equated to approximately 1.5 percent weekly interest (or "vig") on

the $100,000 loan.  In February 2021, Ragano loaned John Doe #2 an additional $150,000

requiring weekly payments, which equated to approximately 1.5 percent weekly interest and

did not reduce the principal.  In July 2021, when Joe Doe #2 was behind in payments, Costa

was recorded as saying that Vincent Ricciardo had told Costa to give John Doe #2 a

"beating":

<blockquote>

COSTA:          The old man says, Tommy, I'd give him a beating if I was you.

CC-1:          Huh, what good is that gonna do?

COSTA:          He goes, he don't understand, he's, he's with you, he don't understand.

</blockquote>

### D.    The Fraudulent Safety Scheme

The Indictment also charges Ragano and Racketeering Defendants Vincent

and Domenick Ricciardo, together with others, in an extensive, lucrative scheme to obtain

fraudulent workplace safety certifications from the Occupational Safety and Health

Administration's ("OSHA") and local regulators in New York State and the New York

City.  As background, OSHA operates a voluntary workplace safety training, which

provides courses for construction and general industry workers to educate them about

hazards a worker may encounter on a job site.  Upon successfully completing either a 10-

hour training program or a 30-hour training program, an attendee is provided a completion

card.  These cards are commonly referred to as the "OSHA-10" and "OSHA-30" cards.

For the past several years, Ragano has operated two "schools" in Franklin

Square and Ozone Park, New York that claimed to provide workplace (and other safety)

trainings, but instead have operated as mills turning out fraudulently obtained safety cards

to hundreds of individuals who never attended any training courses.  Ragano would charge as much as $500 per card, and enrolled dozens of applicants per course.  The scheme thus generated tens of thousands of dollars monthly.  In October 2020, an undercover law enforcement officer visited the Ozone Park school and obtained from Domenick Ricciardo a blank test form for the OSHA-30 card, an answer sheet for that test, and a sign-in sheet for the class roster.  Several weeks later, the undercover officer returned to pick up his OSHA-30 card, paying a total of $500.  Domenick Ricciardo also subsequently provided UC-1 a New York City site-safety training ("SST") card in exchange for $450, despite the undercover officer, again, having not attended any required training classes or completed any class requirements.

The investigation has further illustrated Ragano's brazenness in his operation.  On April 19, 2021, at his OSHA school in Franklin Square, Ragano was recorded discussing the OSHA scheme during a conversation about whether Ragano's former girlfriend could report anything about his activities to law enforcement.  The conversation occurred one day after Ragano slashed the tires of his former girlfriend's automobile: "The only thing she could do is call the cops and tell them I'm doing OSHA . . . . If she calls the cops and she tells them that?  I'll just tell them, hey, okay, put me in jail, what's the problem?  No, non-violent, Pal, what are they gonna give me, three years? . . . . I ain't afraid to go to jail for this, it's non-violent, I'll get 35 months, 40 months, [claps hands], and I'll be home, at 65.  Not a problem."

E.    Drug Trafficking

Racketeering Defendants Vincent Ricciardo and Costa, along with Bonanno soldier John Ragano are also charged with conspiring to distribute marijuana in New York

17

and Florida.  Based on consensual recordings, text message sent over encrypted messaging applications, and witness testimony, the plan involved transporting large shipments of marijuana by vehicle to Florida.  The scheme included a plan by Ragano (and co-defendants Vincent Martino and John Glover) to purchase samples of marijuana to determine which sample to then obtain in large quantities, and Ragano, Costa and Martino agreeing to transport distribution-quantity shipments of marijuana.

In June 2021, the investigation found that Ragano had picked up one-pound samples of two different types of marijuana from Costa and Martino and brought them back to the Ozone Park OSHA school.  Ragano and Glover then began contacting potential buyers in New York by phone to secure commitments to purchase large quantities of marijuana. Costa and Martino then received money from sales at Martino's business located in Suffolk County.

F.    Uncharged Violent Acts and Threats

The wiretap interception and the consensual recordings further indicate the Racketeering Defendants' propensity for violence generally and specifically toward those they believed have wronged or disrespected them.

For example, on June 21, 2021, Vincent Ricciardo described his and Uvino's violent nature, stating:

> I'm trying to be nice to everybody, but let me tell you something, you definitely don't want to see the other side of me, and that's the same with Michael. You never wanna see the other side of Michael, we joke around, we do this, we do that, we say this, let me tell you something, it's nothing to fuck with, I learned the hard way, and you think I'm going to let somebody dictate to me? No, not after I did the right thing all my life.

A week later, in another consensual recording when Vincent Ricciardo was discussing John Doe #1's salary from the Labor Union, Vincent Ricciardo further illustrated Uvino's violent nature, stating, "If I ever showed this to Michael?  He'd go right to his house and punch him in the fucking face, and not give a fuck, and not say a word."  In another example, in an intercepted telephone conversation with Vincent Ricciardo on November 25, 2020, Costa offered to commit violence on Ricciardo's behalf, stating, "I'll put my black sweatsuit on and my fucking face mask and crawl in his house and help him think about it.  When he wakes up, I'll be lying in bed with him."

As the recorded conversations indicate, the Racketeering Defendants are particularly hostile toward those they believe to be cooperating with law enforcement.  For example, on April 20, 2021, in a consensually recorded conversation, Vincent Ricciardo explained to Uvino and other crime family members, "You know a guy's no good, you do what you gotta do, that's it there's nothing to discuss."

Consigliere Ralph DiMatteo also discussed his use of violence and threats, as part of his work with LCN, during an intercepted telephone conversation in December 2020:

| | |
|---|---|
| DIMATTTEO: | He said yea I don't know what you're doing but you're scaring the shit out of me. |
| UF: | Hahah. |
| DIMATTEO: | I said so it's working? I said that's what I do for a living, I get people like you and I scare them. |

In another example, on April 28, 2021, in a consensually recorded conversation, Vincent Ricciardo discussed the potential murder of another crime family member, whom Ricciardo and others believed to be cooperating with the government.

| V. RICCIARDO: | . . . he makes the whole family look like shit, just like this fucking [Colombo crime family member's name], what he said yesterday? He made a big mistake, he signed his own death certificate, he signed his own death certificate. |
|---|---|
| Co-Conspirator: | He's been putting his foot in his mouth for years. |
| V. RICCIARDO: | Oh no, he's dead now, he's finished, he told number three I told my son not to send money over there no more, I stopped it, he signed his own death certificate by saying that. And that old man wasn't happy either. |

DISCUSSION

I.      Legal Standard

     A.      Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or poses a risk of flight or obstruction of justice.  See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight or obstruction of justice must be supported by a preponderance of the evidence.  United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405; United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, (2) the weight of the

evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  In addition, a court may order detention if there is a "serious risk that the [defendant] will ... obstruct or attempt to obstruct justice, or . . .  intimidate . . . a prospective witness," among other things.  18 U.S.C. § 3142(f)(2)(B).

B.      The Racketeering Defendants

Defendants affiliated with organized crime pose a particular threat to the community due to the continuing nature of the crime families' violent criminal activities. Because organized crime defendants are affiliated with an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  See, e.g., United States v. Salerno, 631 F. Supp. 1375 (S.D.N.Y. 1986) (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

Courts in this Circuit have routinely addressed the issue of pretrial detention of organized crime defendants and determined detention was appropriate.  See, e.g., United States v. Giallanzo, et al., 17-CR-155 (DLI) (E.D.N.Y. 2007) (case in which Bonanno family acting captain Ronald Giallanzo, soldiers Michael Palmaccio, Michael Padavona and Nicholas Festa and associates Christopher Boothby, Evan Greenberg, Michael Hintze and Robert Tanico all detained as dangers to the community); United States v. Cirillo, No. 05-CR-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 F. App'x 40 (2d Cir. 2005); United States v. Gotti,

219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Defede, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail, and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

1.     Leaders of a Violent Criminal Enterprise Are Dangerous Due to Their Position of Authority in That Enterprise

Pretrial detention is warranted when defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this Circuit have recognized that when organized crime

depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, in Defede, Luchese crime family member Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese family, thus rendering him a danger to public safety: "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence. Defede's continued liberty therefore presents a substantial danger to the public . . . ."  Defede, 7 F. Supp. 2d at 395.

Moreover, a court in this District denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," Cirillo, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11.  The Second Circuit affirmed those findings by summary order.  See 149 F. App'x at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise." (citing Ciccone, 312 F.3d at 543)).

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  Ciccone, 312 F.3d at 542-43; see also

Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."  Gotti, 219 F. Supp. 2d at 299–300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise.  As the court held in Defede:

> [I]t is well established that persons who hold Defede's status routinely engage in conduct that is a menace to public safety. The argument thus is based not on the status, but on the inference that a person in Defede's position is quite likely to engage in dangerous conduct -- just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

7 F. Supp. 2d at 392 n.4.  Moreover, in enacting the Bail Reform Act, Congress recognized that certain defendants, such as high-ranking members of an organized crime family fall within a "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Colombo, 777 F.2d at 99 (quoting S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses." In <u>Salerno</u>, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise. Likewise, in <u>Colombo</u>, 777 F.2d at 99-100, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of orchestrating a series of violent criminal operations." (internal quotation marks omitted).

2.      The Racketeering Defendants Are Likely
        <u>to Commit Crimes if Released on Bail</u>

The Racketeering Defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities. At bottom, because organized crime defendants are career criminals who have pledged their loyalty to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail. <u>See</u> <u>Salerno</u>, 631 F. Supp. at 1375. The Racketeering Defendants need not have personally committed violent acts to warrant detention. Rather, the ability to direct others has been found to be dispositive. <u>See, e.g.</u>, <u>United States v. Bellomo</u>, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996); <u>United States v. Colombo</u>, 777 F.2d 96, 98 (2d Cir. 1985); <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993); <u>Defede</u>, 7 F. Supp.2d at 395. In this context, the courts have made it clear that "the dangerousness of a defendant [is not] determined solely by looking at the acts charged in the indictment." <u>Bellomo</u>, 944 F. Supp. at 1166.

In addition, the Racketeering Defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community. See Senate Rep. No. 225, 98th Cong. 1st Sess., 6-7, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3195-96 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In Colombo, the court held that "[i]n light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'" Colombo, 777 F.2d at 99 (quoting Senate Report at 3189). In Salerno, the court upheld the detention of two leaders of the Genovese organized crime family, noting:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self-evident.

631 F. Supp. at 1375.

3.    Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Racketeering Defendants

The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including members of organized crime families shown to be involved

in violent criminal activities.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail

secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993)

(rejecting $3 million bail secured with real property, in-home detention, restricted visitation

and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting,

among other conditions of release, $500,000 bail secured by real property); see also United

States v. Boustani, 932 F.3d 79 (2d Cir. 2019) (holding that Bail Reform Act does not permit

two-tiered bail systems where wealthy defendants are effectively released to self-funded

private jails).

       The Second Circuit has viewed home detention and electronic monitoring as

insufficient to protect the community against dangerous individuals.  In United States v.

Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff
> to monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted).  See also

Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the

wonders of science and of sophisticated electronic technology" (internal citation and

quotation marks omitted)).  Notably, in United States v. Dono, where the prior pretrial

detention of defendant Michael Uvino was at issue for assaulting two individuals in

September 2007 and using a firearm during the assault, the Second Circuit rejected

conditions that included, among others, home detention and electronic monitoring, and

requirement that Uvino's father—a retired police officer—take "personal responsibility" for defendant.  See 275 F. App'x 35, 2008 WL 1813237, at *2-3 (2d Cir. Apr. 23, 2008).

Similarly, courts in this District have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., Dono, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'" (quoting Orena, 986 F.2d at 632)); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

II.     The Racketeering Defendants Should Be Detained

A.     The Racketeering Defendants Are a Danger to the Community

Defendants Andrew Russo, Benjamin Castellazzo, Thomas Costa, Ralph DiMatteo, Richard Ferrara, Theodore Persico, Jr., Domenick Ricciardo, Vincent Ricciardo and Michael Uvino, along with Bonanno solider John Ragano, pose a substantial danger to

employees of the Labor Union, including John Doe #1 and his family, government witnesses, and the community at large.  Each defendant is affiliated with a violent criminal enterprise and is charged in one or more schemes that rely on threatened violence.  As discussed more specifically below, each of the relevant considerations under the Bail Reform Act strongly favors detention.

      1.    <u>Nature and Circumstances</u>

As described above, the Racketeering Defendants are charged with, among other things, Hobbs Act extortion[6]  and extortionate collection of credit,[7] and conspiracy to

---

[6]    Extortion and conspiracy to commit the same is a crime of violence under the Bail Reform Act.  <u>See</u> <u>Ciccone</u>, 312 F.3d 542 ("Certainly, it cannot be gainsaid that extortion is a 'crime of violence' as that term is defined by the BRA."); <u>United States v. Santora</u>, 225 F. App'x 21, 22 (2d Cir. 2007) (upholding district court's finding for pretrial detention purposes that defendant "had committed a crime of violence, specifically conspiracy to commit extortion" (citing 18 U.S.C. § 3142(e); <u>Ciccone</u>, 312 F.3d at 541)) (unpublished decision).

    Extortionate collection of credit and conspiracy to commit the same also qualify as crimes of violence.  <u>See</u> 18 U.S.C. § 891(7) (defining "extortionate means" to be "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person"); <u>id.</u> § 3156(a)(4)(A) (defining "crime of violence" as having as an element "the use, attempted use, or threatened use of physical force against the person or property of another"); <u>United States v. Cicale</u>, 2006 WL 2252516 (E.D.N.Y. Aug. 7, 2006) ("It is the law of this circuit, as conceded by the defense . . . , that the two loansharking counts against Cicale are crimes of violence, and are especially probative of dangerousness where, as here, the Defendant is alleged to have assaulted a victim to collect a debt." (citing <u>United States v. Rodriguez</u>, 950 F.2d 85, 88 (2d Cir.1991) (finding that violence committed "over a small debt is probative of dangerousness")) (unpublished decision); <u>United States v. DiGiacomo</u>, 746 F. Supp. 1176, 1185 (D. Mass. 1990) (designating loansharking as "crime of violence" for Bail Reform Act purposes).

[7]    Extortionate collection of credit and conspiracy to commit the same also qualify as crimes of violence.  <u>See</u> 18 U.S.C. § 891(7) (defining "extortionate means" to be "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person"); <u>id.</u>

commit both offenses.  These offenses are crimes of violence under the relevant provisions

of the Bail Reform Act.  See Ciccone, 312 F.3d at 542  (citing 18 U.S.C. § 3156(a)(4)(A),

(B)) (Bail Reform Act defines a "crime of violence" as an offense that has as one of its

elements the "attempted use, or threatened use of physical force against the person or

property of another," or "any other offense that is a felony and that, by its nature, involves a

substantial risk that physical force against the person or property of another may be used in

the course of committing the offense"); Chimurenga, 760 F.2d at 404 (conspiracy to commit

a crime of violence is a crime of violence for purposes of the Bail Reform Act).  Ragano is

charged with extortionate collection of credit and drug-trafficking, and is thus subject to a

presumption of detention (along with Vincent Ricciardo and Domenick Ricciardo) on

multiple grounds.[8]

The circumstances of the Racketeering Defendants' involvement in these

schemes further demonstrate the need for their pretrial detention.  Under the supervision of

the Colombo crime family, Vincent Ricciardo, Michael Uvino and Domenick Ricciardo

---

§ 3156(a)(4)(A) (defining "crime of violence" as having as an element "the use, attempted
use, or threatened use of physical force against the person or property of another"); United
States v. Cicale, 2006 WL 2252516 (E.D.N.Y. Aug. 7, 2006) ("It is the law of this circuit, as
conceded by the defense . . . , that the two loansharking counts against Cicale are crimes of
violence, and are especially probative of dangerousness where, as here, the Defendant is
alleged to have assaulted a victim to collect a debt." (citing United States v. Rodriguez, 950
F.2d 85, 88 (2d Cir.1991) (finding that violence committed "over a small debt is probative of
dangerousness")) (unpublished decision); United States v. DiGiacomo, 746 F. Supp. 1176,
1185 (D. Mass. 1990) (designating loansharking as "crime of violence" for Bail Reform Act
purposes).

[8]    The charged offense arises under the Controlled Substances Act and thus there
is a presumption that "no condition or combination of conditions will reasonably assure the
appearance of the [defendants] as required and the safety of the community."  18 U.S.C.
§ 3142(e)(3)(A).

carried out the day-to-day orders of their superiors to steal and extort money from a labor organization. This resulted in real fear, violence and threats experienced by and directed toward the employees of the Labor Union and its Health Fund. The defendants have visited John Doe #1's home, researched where other victims and their families live, contacted and attempted to contact multiple victims by phone or simply tried to surprise them in person, and have appeared unannounced at workplaces. In what they believed were private conversations, they have verbalized the real and serious violence that they are willing to perpetrate if the victims cooperate with law enforcement or go against the crime family's wishes. Indeed, the specter of violence and what the Racketeering Defendants said they are capable of doing is reflected by the Indictment itself. Ensuring they are detained is the minimum necessary to protect those who the Colombo crime family has targeted for years.

   The Racketeering Defendants supervised and directed the charged schemes and these threats of violence. Wiretap interceptions show that even Russo, the boss of the family, was aware of John Doe #1's identity (including using his name) and the need for his cooperation with the crime family's scheme to infiltrate the Labor Union and the Health Fund. As explained, intercepts and consensual recordings demonstrate that at various times, DiMatteo, Ferrara and Castellazzo directly supervised Vincent Ricciardo's attempted takeover. By the filing of the Indictment and other publicly docketed material, the Racketeering Defendants are now aware that witnesses have cooperated with the government, including John Doe #1. The recorded conversations discussed above illustrate the danger to this individual, and others, were the Racketeering Defendants to be released.

   As described above, the Racketeering Defendants also pose a danger to the community because as members of organized crime, the defendants are career criminals who

have pledged their loyalty to an illegal enterprise, and they pose a distinct likelihood of committing additional crimes if released on bail.  As explained, various defendants were also involved in other criminal schemes, including schemes to collect extortionate loans, issue fraudulent OSHA safety certifications, traffic distribution quantities of marijuana and transport ammunition despite prior felony convictions.

In committing these criminal acts, the Racketeering Defendants have also taken extensive measures to evade detection by law enforcement, including by conducting counter-surveillance during forced meetings with John Doe #1 and using "burner" phones to communicate with each other.

> 2.    History and Characteristics of the Racketeering Defendants

The Racketeering Defendants' history and characteristics also clearly favor detention.

> a.    Andrew Russo

Andrew Russo is the boss of the Colombo crime family and is charged with, among other crimes, racketeering, including extortion and money laundering conspiracy as predicate acts, as well as conspiracy to steal and embezzle health benefit funds and attempted health care fraud and conspiracy to commit health care fraud.  As charged here, as well as in prior cases, Russo was the boss of a violent criminal enterprise.  In his capacity as the boss, he has attended numerous meetings with other high-ranking Colombo crime family members.  Even after his prior arrest in 2011, Russo continued in his efforts as boss while incarcerated.

Russo has seven prior convictions, including assault, racketeering and jury tampering.  In 2011, Russo was indicted in this District for racketeering, among other crimes,

in connection with his then role as the street boss of the Colombo crime family.  See Case

No. 11-CR-30-KAM.  In that case, Russo was detained pending trial.  In the government's

detention memorandum, it noted that conversations intercepted via wire intercept and

consensual recording had made clear that Russo "will not hesitate to personally engage in

violence."  See Case No. 11-CR-30, ECF Dkt No. 245-2, at 31.  The government cited one

consensually recorded conversation in which Andrew Russo commented, "I don't hesitate,

I've never hesitated" to hurt an individual if the individual stepped out of line.  Id.  As cited

in the memorandum, Russo has also made clear that he has no intention of disassociating

himself from the Colombo family or La Cosa Nostra.  He stated, "I can't walk away.  I can't

rest."  Id.  This sentiment was corroborated by a consensual recording in this case, in which

Uvino explained, "The problem is, that old man, he wanted to be boss his whole life, his

cousin was there, so."  This sentiment further explains why, at 87 years old, Russo continues

to supervise the crime family's extortion and money laundering scheme.

Prior to 2011, Russo also had convictions for assault (resulting in a

fractured jaw for the victim of the assault); attempted tax evasion; conspiracy to bribe an

agent with the Internal Revenue Service; racketeering conspiracy (once in 1985 and again in

1996); and obstruction of justice.  His criminal history (i.e., one involving violent acts as a

younger man and less violent acts as an older man) is consistent with the operations of the

mafia, in which an individual with increasing rank in the criminal organization no longer

needs to engage in violent crimes, and further insulates himself from law enforcement

scrutiny.  That occurred here, where Vincent Ricciardo, Uvino and others were the front men

for the direction from the administration members above them.

    b.  Benjamin Castellazzo

Castellazzo is a long-time underboss of the Colombo crime family.  He is charged with, among other crimes, racketeering, including extortion and money laundering conspiracy as predicate acts, as well as extortion, money laundering conspiracy, conspiracy to steal and embezzle health benefit funds, attempted health care fraud and conspiracy to commit health care fraud.  Castellazzo has prior convictions for his association with the Colombo crime family involving extortionate collection of credit conspiracy and racketeering.

In his most recent federal conviction, in 2013, Judge Matsumoto sentenced Castellazzo to 63 months' imprisonment for his racketeering conviction.  In addition, his history includes four other convictions.  In 2002, Castellazzo was sentenced by Judge Glasser to a three-year term of imprisonment based on his conviction for conspiring to collect extortionate extensions of credit.  That crime was committed while Castellazzo was a captain in the Colombo crime family, and the extorted money reflected payments for credit, gambling and other criminal activity conducted at a social club owned and supervised by Castellazzo.  Before that, in 1995, Castellazzo was sentenced to an eight-month term of imprisonment following a conviction for operating an illegal gambling business.  That conviction was based on the Castellazzo's participation in a business that, under the auspices of LCN, held craps games, conducted illegal numbers betting operations and accepted wagers on sporting events.  Before that, in 1976, Castellazzo was sentenced to a four-year term of imprisonment following a conviction for the unlawful use of a telephone in the commission of a felony.  That conviction was based on Castellazzo's role in a heroin importation and distribution ring.  And before that, in 1959, Castellazzo was sentenced to a four-to-eight-year term of imprisonment following his conviction for grand larceny.  That

conviction was based on the defendant's theft, with others, of a tractor-trailer truck containing carpeting.

In his role as underboss, Castellazzo directly oversaw, and profited from, the crimes committed by those below him.  Without a hierarchy, of which the defendant, as the underboss, was a critical member, structured criminal organizations such as the Colombo crime family could not thrive or even survive.  That is, members and associates of the crime family could not commit the bread and butter crimes of the mafia such as extortion and loansharking, if not for Castellazzo.

        c.    <u>Thomas Costa</u>

Costa is an associate of the Colombo crime family, who is due to be inducted as a member this fall, according to a consensual recording made during the investigation.  On April 27, 2020, Vincent Ricciardo and Uvino spoke to Costa about a list of newly proposed members to join the five families of La Cosa Nostra.  Vincent Ricciardo further advised Costa:

| V. RICCIARDO: | This comes before your kids, your grandchildren, your wife… |
| COSTA: | You made it clear that day. |
| V. RICCIARDO: | Okay, but anyway, that's what's happening. |
| COSTA: | Soon? |
| UVINO: | (laughs) tomorrow? |
| COSTA: | I'm saying soon? |
| UVINO: | Yes, it's gotta be. It'll be this year. |

Costa is charged with, among other crimes, racketeering, including extortionate collection of credit and conspiracy to distribute and possess with intent to

distribute marijuana as predicate acts, as well as conspiracy to make false statements, extortionate collection of credit conspiracy and extortionate collection of credit, transportation and possession of ammunition by a felon, conspiracy to distribute and possess with intent to distribute marijuana.  Costa has previous convictions for money laundering conspiracy, in which he admitted during his guilty plea that he and two other contractors bribed a New York City official and submitted false bills.

> d.  <u>Ralph DiMatteo</u>

DiMatteo is the consigliere of the Colombo crime family.  DiMatteo is charged with, among other crimes, racketeering, including extortion and money laundering conspiracy as predicate acts, as well as extortion, money laundering conspiracy, conspiracy to steal and embezzle health benefit funds, attempted health care fraud and conspiracy to commit health care fraud.  As described above, other inducted members repeatedly referenced DiMatteo as "number three" when discussing his position; and during the loansharking scheme, DiMatteo played an active, direct role in interfacing with Vincent Ricciardo.  The wiretap interceptions also showed the command he had over lower-ranking crime family members, including summoning them immediately to meetings at Russo's home or to report to "Brooklyn," a reference to meet at a garage in Gravesend.

DiMatteo has prior convictions for conspiracy to distribute heroin and money laundering conspiracy.  In 1985, DiMatteo was convicted of conspiracy to distribute heroin and drug trafficking offenses in this District, and sentenced to 96 months' imprisonment.  In 2001, DiMatteo was convicted of conspiracy to commit money laundering and sentenced to 18 months' imprisonment.

e.   Richard Ferrara

Ferrara is a captain within the Colombo crime family.  Ferrara is charged with, among other crimes, racketeering, including extortion and money laundering conspiracy as predicate acts, as well as extortion, money laundering conspiracy, conspiracy to steal and embezzle health benefit funds, attempted health care fraud and conspiracy to commit health care fraud.  During the investigation, Ferrara was identified as a trusted advisor to the Colombo family's administration and a person to whom oversight of the labor racketeering scheme could be given.  Law enforcement surveillance repeatedly identified him meeting with DiMatteo, but also working closely with Persico.  For example, on March 29, 2021, Ferrara and Persico spoke by telephone (TP #468), and Persico told Ferrara: "I'm actually going to take a ride to Long Island real quick to see my brother, I don't know if you wanted to take a ride or not," to which Ferrara agreed.  GPS location for Persico's phone then showed his telephone in the vicinity of Russo's residence in Glen Head, New York.  Law enforcement officers commenced surveillance showed Persico's vehicle leaving Russo's residence at 10:55 p.m. that night.  And on April 1, 2021, when Vincent Ricciardo and Uvino went to Persico's autobody shop in Staten Island to meet, Ferrara was also observed by law enforcement as present.

Ferrara has prior convictions for robbery and conspiracy to defraud the United States.  Ferrara was convicted in New York State Supreme Court in June 1979 of felony robbery in the second degree and sentenced to two- to six-years' imprisonment.  In 1999, Ferrara convicted for conspiracy to defraud the United States in the U.S. District Court for the District of New Jersey (No. 98-CR-735-JEI) and received a sentence of 21 months' imprisonment.

f.      Theodore Persico, Jr.

Persico is a captain within the Colombo crime family.  As described above, Persico is expected to become the boss of the Colombo crime family after Russo.  Persico is charged with, among other crimes, racketeering, including extortion and money laundering conspiracy as predicate acts, as well as extortion, money laundering conspiracy, conspiracy to steal and embezzle health benefit funds, attempted health care fraud and conspiracy to commit health care fraud.

Persico is currently serving a term of supervised release following his conviction in 2014 for conspiracy to commit murder-in-aid of racketeering.  Under Federal Criminal Rule 32.1 of the Federal Rules of Criminal Procedure, the defendant on supervised release bears the "burden of establishing by clear and convincing evidence that [he] will not flee or pose a danger to any other person or to the community."  Given the charges against him, Persico cannot satisfy that showing.

Persico also has prior convictions for attempted grand larceny, criminal sale of a controlled substance and racketeering, and he has spent most of his adult life in prison.  For instance, in or about 1987, Persico was arrested for criminal sale of a controlled substance in the second degree and later received a sentence of 25 years' imprisonment.  In or about 2004, Persico was released to parole.  In 2005, just over a year after his release from state custody, Persico was arrested by the FBI and charged with racketeering related to his role in the Colombo family, in the U.S. District Court for the Eastern District of New York (No. 05-CR-351-SLT) and was later sentenced to 42 months' custody and a three-year term of supervised release.  He was released from custody in 2008.  In or about 2010, less than two years after his release, Persico was arrested and charged with racketeering and related offenses in the

U.S. District Court for the Eastern District of New York, related to his role in the Colombo family (No. 10-CR-147-SLT), as well as violations of his supervised release (No. 05-CR-351-SLT). Persico subsequently pleaded guilty to murder conspiracy in-aid-of racketeering and was later sentenced to 120 months' imprisonment (the statutory maximum) for that offense and for 24 months' imprisonment (the statutory maximum) as a result of his violation of supervised release. Less than two years since his release, Persico has been arrested once again.

In addition to the new criminal conduct, Persico's flagrant violations of the supervised release non-association condition demonstrates the low probability that he would comply with any meaningful conditions of pre-trial release.

> g. <u>John Ragano</u>

Ragano is a soldier within the Bonanno crime family and is charged with, among other crimes, fraud in connection with means of identification and conspiracy to commit fraud in connections with means of identification, conspiracy to make false statements, extortionate collection of credit conspiracy and extortionate collection of credit, and conspiracy to distribute and possess with intent to distribute marijuana.

Ragano has a prior conviction for kidnapping in the second degree for which he was sentenced to ten years' imprisonment in 1999. The alleged facts underlying this offense are particularly disturbing: Ragano displayed a handgun and held up an accounting firm in Ozone Park, ordering the firm's owners to turn over all of the firm's cash. When one of the owners informed him that the firm no longer dealt in cash, Ragano told him that he wanted the security code for the owner's house. Ragano then told the owner what the address of the owner's house was, and stated that he and his accomplices had someone

watching the owner's house.  Ragano and an accomplice then used flex cuffs to tie up the owners in the back room of the firm.  Soon thereafter, the police arrived and a hostage situation ensued.  Ragano and his accomplice ultimately surrendered, and Ragano hid the firearm he had used in the robbery in a filing cabinet, which was recovered the next day. Ragano also was convicted in 2002, while serving a lengthy sentence in state custody, in the Eastern District of New York, of federal conspiracy and theft of government fund charges, for which he received a sentence of 30 months' imprisonment, to be followed by three years' supervised release, as well as $68,923 in restitution.  Apparently in light of his long state sentence, Ragano did not begin his period of federal supervised release until 2010, and the term did not expire until February 2013.  In or about January 2014, Ragano was indicted in the U.S. District Court for the Eastern District of New York, where he was charged with racketeering conspiracy and alleged to be an inducted member and solider of the Bonanno crime family (No. 14-CR-26-ARR).  In March 2015, Ragano was sentenced to 51 months' imprisonment and three years' supervised release for his conviction of racketeering conspiracy.  He was released in or about October 2017 and finished his three-year term of supervised release in October 2020.

In multiple recorded conversation, Ragano has demonstrated a willingness to commit violence.  For example, on April 19, 2021, in a consensually recorded conversation, Ragano discussed slashing the tires on the prior day of three different vehicles as retaliation in a business dispute.  He stated, "If I gotta go back to jail, I'll go back to jail."  Later in the conversation, in reference to the associate and her property, he stated, "I'm going to burn everything, and there ain't no camera."  Law enforcement officers later confirmed that the parked cars Ragano had described had flat tires.  In another example, on June 2, 2021, in a

consensually recorded conversation, Ragano discussed "beating a guy with a baseball bat …beat him with a bottle of fucking heneiken…I cracked him over his head."

      h.   <u>Domenick Ricciardo</u>

Domenick Ricciardo is an associate within the Colombo crime family and is charged with, among other crimes, racketeering, including extortion and conspiracy to commit fraud in connection with means of identification as predicate acts, as well as extortion, conspiracy to commit fraud in connection with means of identification, fraud in connection with means of identification and conspiracy to make false statements.

As described above, Domenick Ricciardo has been directly involved in threatening John Doe #1, including by sending threatening text messages and personally collecting extortion payments. For example, video surveillance footage showed that on January 26, 2020, Domenick Ricciardo went to John Doe #1's home unannounced to demand Vincent Ricciardo's "pension" payment. In subsequent text messages, Domenick Ricciardo ("DR") repeatedly pressured John Doe #1 ("JD#1") by text message:

**April 2, 2020**
| | | |
|---|---|---|
| DR | (1:19 p.m.): | Whats up? U stopping by? |
| | (2:05 p.m.): | Hey this is the 2nd text, there isnt going to be a 3rd. |
| JD#1 | (2:06 p.m.): | [Restaurant name] |
| | (2:06 p.m.): | Don't understand |
| DR | (2:09 p.m.): | ? Its there? |
| JD#1 | (2:09 p.m.): | It's been there since I was asked last week |
| DR | (2:10 p.m.): | First im hearing about it |
| | (2:13 p.m.): | They open? |
| JD#1 | (2:14 p.m.): | Yes. |

When John Doe #1 delivered less than the expected $2,600 payment, Domenick Ricciardo pressured John Doe #1 for the additional money:

**May 2, 2020**
| | | |
|---|---|---|
| DR | (1:00 p.m.): | What time do u want to met? |

|       | (1:40 p.m.): | Did u talk to ur friend yet? |
|-------|--------------|------------------------------|
|       | (1:47 p.m.): | How about a yes or no |
|       | (2:53 p.m.): | Im not texting no more |
| JD#1  | (3:26 p.m.): | Didn't have my phone. |
| DR:   | (3:29 p.m.): | Ck with ur boss |
| JD#1  | (3:30 p.m.): | Don't know what you want to hear.  I can't give what I don't have. |

When Vincent Ricciardo met with John Doe #1, Domenick Ricciardo, among others, provided countersurveillance of the meeting, attempting to identify if John Doe #1 was working with law enforcement.

Domenick Ricciardo also played a key role in the fraud scheme at Ragano's OSHA schools, including by assisting in the falsification of paperwork. Throughout his involvement, Domenick Ricciardo closely followed the direction of inducted Colombo family members above him.

### i.    Vincent Ricciardo

Vincent Ricciardo is a captain within the Colombo crime family and is charged with, among other crimes, racketeering, including extortion, conspiracy to commit fraud in connection with means of identification, extortionate collection of credit and money laundering conspiracy as predicate acts, as well as a violation of disqualification in connection and transportation and possession of ammunition by a felon.

Vincent Ricciardo's clear and explicit threats toward John Doe #1, as recounted in part above, speak for themselves.  He, along with the members of his crew, including Uvino, Domenick Ricciardo, and Costa pose a clear threat to John Doe #1 and others in this case.  Moreover, this is the third time Vincent Ricciardo has been charged in connection with a scheme involving a labor union.  In May 1990, Vincent Ricciardo was charged in a racketeering conspiracy related to a scheme to control the awarding of window

contracts in the so-called "Windows Case."  See Docket No. 90-CR-446 (E.D.N.Y.).

Vincent Ricciardo was subsequently convicted of racketeering conspiracy, sentenced to five

years' probation and was ordered to sever ties with labor organizations.  Despite that Court

order, in 2004, Vincent Ricciardo pleaded guilty to racketeering, related to the extortion of

two local unions of positions and benefit plans contributions, among other acts.  As part of

his 2004 conviction, Vincent Ricciardo was barred under the Labor-Management Reporting

and Disclosure Act of 1959 and Employee Retirement Income Security Act, from holding

any role, representing or consulting with any labor organization or benefit fund for a period

of 13 years commencing from on or about November 5, 2008 (the date of Vincent

Ricciardo's release from prison); thus, he is barred until November 5, 2021, and was still

barred when he demanded John Doe #1 provide money and influence from the Labor Union.

j.      Michael Uvino

Uvino is a solider and acting captain the Colombo crime family and is charged

with, among other crimes, racketeering, including extortion and money laundering

conspiracy as predicate acts, as well as extortion, money laundering conspiracy, conspiracy

to steal and embezzle health benefit funds, attempted health care fraud and conspiracy to

commit health care fraud.

On or about December 24, 2008, Uvino was convicted of racketeering and

other charges in the United States District Court for the Eastern District of New York in

connection with his role within the Colombo crime family (No. 07-CR-725-JBW).  See

United States v. Dey, 409 F. App'x 372, 374 (2d Cir. 2010) (affirming convictions).  Uvino

was released on or about June 3, 2016 and his term of supervised release ended in 2019.

Furthermore, through his conduct, Uvino has indicated he will not comply with court orders.  Uvino was fined $100,000 as part of his 2008 conviction, and that fine has still not been paid in full.  Notably, at the time of Uvino's sentencing in that matter, the government brought to the Court's attention that Uvino used family members to hold his assets, pay his bills, and otherwise avoid having assets in his name.  Here, banking records show the $100,000 extortionate loan was drawn from Uvino's family member's bank account.

      3.    <u>Seriousness of the Danger Posed by the Defendants' Release</u>

The seriousness of the danger posed by the defendants' release cannot be underestimated in light of their affiliation with the Colombo family, a violent criminal enterprise, and their involvement in crimes of violence.  As noted above, courts in this Circuit have recognized that when organized crime defendants, such as the defendants in this case, are charged with employing violent conduct, the risk of continued violent conduct is substantial and justifies detention.  <u>See Salerno</u>, 631 F. Supp. at 1364.

      4.    <u>Evidence of the Defendants' Guilt</u>

As discussed above, the evidence of the defendants' guilt is exceedingly strong.  The government intends to prove the defendants' guilt at trial through the testimony of numerous witnesses, including a cooperating witness who was once a co-conspirator of the Racketeering Defendants.  In addition, the defendants were intercepted on wiretaps and consensual recordings discussing charged crimes.  Physical and documentary evidence, such as phone records, and surveillance evidence underscore the defendants' guilt.

*     *     *

In sum, in considering each of four relevant detention factors, the aforementioned defendants are a danger to the community and should be detained.

B.     The Racketeering Defendants Constitute Risk of Flight

The Racketeering Defendants face significant jail time.  Racketeering, extortion, money laundering conspiracy and extortionate collection of credit all carry twenty-year statutory maximum sentences.  Given the advanced age of some of the Racketeering Defendants, such a sentence would likely constitute a life sentence.

The significant sentences faced by these defendants give them a substantial incentive to flee.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).  In addition, the defendants have also maintained their membership in or association with the Colombo family despite convictions related to their membership in and association with the Colombo crime family.

Moreover, several of the Racketeering Defendants, namely Costa, Ragano, Domenick Ricciardo and Vincent Ricciardo, are charged with crimes involving fraud in connection with means of identification.  Therefore, they should not be trusted to abide by release conditions.  See United States v. Hollender, 162 F. Supp. 2d 261, 265-66 (S.D.N.Y. 2001) (a defendant's ability to flee, in light of involvement in "crimes the nature of which involve deception [and] that those deceptions are alleged to have included the use of false and fictitious identities," supported a finding that the defendant was a flight risk).

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the

Court enter permanent orders of detention with respect to defendants Andrew Russo,

Benjamin Castellazzo, Thomas Costa, Ralph DiMatteo, Richard Ferrara, Theodore Persico,

Jr., John Ragano, Domenick Ricciardo, Vincent Ricciardo and Michael Uvino.

Dated:  Brooklyn, New York
        September 14, 2021

                                       Respectfully submitted,


                                       JACQUELYN M. KASULIS
                                       ACTING UNITED STATES ATTORNEY
                                       Eastern District of New York
                                       Attorney for Plaintiff
                                         271 Cadman Plaza East
                                       Brooklyn, New York 11201


By:  _____/s/_____
                      James P. McDonald
                      Devon Lash
                      Assistant United States Attorneys
                      (718) 254-7000