UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA           :

     -against-                           :           21 CR 466 (DG)

ANDREW RUSSO ET AL.             :

                                        :
------------------------------------------------------------X

# MOTION FOR BAIL
## FOR DEFENDANT THEODORE PERSICO

JOSEPH R. COROZZO
Rubinstein & Corozzo, LLP
*Attorneys for Defendant*
*Theodore Persico*
260 Madison Avenue, 22nd Fl.
New York, New York 10016
Ph. (212) 545-8777
Fax (917) 722-8206
jcorozzo@rubcorlaw.com
Angela D. Lipsman, Esq.
On the Memorandum

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................ 1

**FACTS** .................................................................................................................. 3

  I.    The Charges. ............................................................................................ 3

  II.    Misinformation from CS-2. ...................................................................... 4

  III.    The Arraignment. ..................................................................................... 8

    A.    November 2020 Meetings ...................................................... 9

    B.    March and April of 2021 ....................................................... 12

    C.    July 20, 2021 Conversation. ................................................. 15

**DISCUSSION** ....................................................................................................... 17

  I.    The Bail Reform Act. ............................................................................. 17

  II.    The Proposed Bail Package. .................................................................... 18

  III.    The Conditions of Release Would Reasonably Assure The Safety of the Community. 20

**CONCLUSION** ..................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

***United States v. Ciccone***, 312 F.3d 535, 543 (2d Cir. 2002)........................................................ 17

***United States v. Enix***, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016) ............................................ 17

***United States v. Goba***, 240 F. Supp. 2d 242, 247 [W.D.N.Y. 2003] ............................................ 17

***United States v. Madoff***, 586 F. Supp. 2d 240, 255 (S.D.N.Y. 2009)........................................... 18

**Statutes**

18 U.S.C. § 3142(e)(1)............................................................................................................. 1, 17

18 U.S.C. § 3142(g) ................................................................................................................. 1, 17

## PRELIMINARY STATEMENT

Under the Bail Reform Act, bail must be granted unless there is <u>no</u> possible combination of conditions that would reasonably assure the safety of the community and the defendant's return to Court. 18 U.S.C. § 3142(e)(1). A number of factors are analyzed in determining whether such conditions exist, including the nature of the charges, the weight of the evidence, the history and characteristics of the defendant, and the seriousness of the danger posed to the community or to any person. 18 U.S.C. § 3142(g).

At the Arraignment, the Government overstated both the weight of the evidence and the seriousness of the danger that would be posed to the community. The Government's argument for detaining Defendant Theodore Persico ("Persico") relied heavily on Mr. Persico's alleged role in the hierarchy of the Colombo racketeering enterprise and his allegedly having given orders to a co-defendant in and around April of 2021. (The Government argued that Mr. Persico would be dangerous if released on bail on the theory that Mr. Persico would give orders to others in the racketeering enterprise).

However, the defense has since learned that, during the investigation, one of the F.B.I.'s sources falsely led the Government to believe that Mr. Persico was the boss of the Colombo racketeering enterprise.

By the time that the Government discovered that this was never the case, the false information had already permanently framed the investigators' and, consequently, the Government's view of the evidence against Mr. Persico. Wherever there were references to the top of the Colombo racketeering enterprise or the administration of the enterprise, the Government took this as evidence of Mr. Persico's involvement in the affairs of the enterprise.

The effect of this confirmation bias is so persistent that the Government insisted at the Arraignment that there was evidence that Mr. Persico was giving orders to a co-defendant in April of 2021 even where they had direct evidence to the contrary, and insisted that he had attended a meeting of members of the top of the hierarchy of the enterprise at a restaurant in Brooklyn on November 10, 2020, even when the Government's own evidence (since disclosed to the defense) actually indicates that Mr. Persico was in a different borough when that meeting took place.

Given the emphasis that the Government placed on Mr. Persico's alleged attendance of the November 10, 2020 meeting, and of his allegedly giving orders to a co-defendant in April of 2021, the Government clearly overstated the strength of the prosecution's case.

Since the Government continued to erroneously conflate Mr. Persico with the administration of the enterprise even at the Arraignment, it appears that they have continued to overestimate his role in the hierarchy and, consequently, to overestimate the danger that he would pose should he be released on bail.

Given the weaknesses in the Government's case, we respectfully submit that the restrictive set of conditions proposed herein will reasonably assure the safety of the community (as well as Mr. Persico's return to Court, though the Government has not made an issue of the likelihood of his return to Court).

We acknowledge that Mr. Persico is accused of having committed the charged offenses in the case at bar while on supervised release, and thus, he is charged in another docket with violating the terms of his supervised release.

In spite of this, we submit that Mr. Persico will honor the terms of his pretrial release if bail is granted. Unlike when he was on supervised release during the time period of the

Indictment, (1) this time he will know that the homes of his loved ones will be at stake should he violate the terms of his release, and (2) there will be very restrictive conditions in place to ensure his compliance—conditions which were <u>not</u> in place during his supervised release.[1]

## **FACTS**

I.    <u>The Charges.</u>

On September 8, 2021, Mr. Persico was one of 14 defendants indicted in the case at bar.

Mr. Persico was arrested on September 14, 2021. He is currently charged with Count 1: Racketeering; Count 2: Hobbs Act Extortion Conspiracy; Count 3: Hobbs Act Extortion, Count 4: Hobbs Act Extortion Conspiracy; Count 5: Attempted Hobbs Act Extortion; Count 13: Money Laundering Conspiracy; Count 14: Conspiracy to Steal and Embezzle Health Care Benefit Funds, Count 15: Health Care Fraud Conspiracy; Count 16: Att. Health Care Fraud; and Count 17: Making False Statements to a Federal Official.

Nine of the aforementioned 10 charges are based on an alleged Extortion Scheme and an accompanying alleged scheme to launder money from the Extortion Scheme. Indictment ¶¶ 23 – 26. The remaining charge (Count 17) accuses Mr. Persico of violating 18 U.S.C. § 1001 by lying to a federal agency (Probation) to conceal his alleged association with members of the racketeering enterprise. (The proceeding regarding Mr. Persico's alleged violations of supervised release is still pending. We are filing bail applications in both this case and the V.O.S.R. proceeding, and proposing the same bail package for both applications.)

Despite the multiple conspiracy charges, the sole overt acts in the Indictment that mention Mr. Persico are an alleged telephone conversation on March 16, 2021 to arrange a

---

[1] Nothing in this application should be construed as an admission of guilt. Mr. Persico maintains the right to go to trial and require the Government to prove their case beyond a reasonable doubt. Nor should anything in this application be construed as an admission of any of the pending charges of Violations of Supervised Release.

meeting, and an alleged meeting at the lead co-defendant's residence on March 29, 2021. Indictment, Count 14, Overt Acts (e) and (g).

## II.    Misinformation from CS-2.

During the course of the investigation, Title III wiretaps were authorized for multiple telephone numbers.[2] The first Title III wiretap application in the investigation was made on August 27, 2020 for telephone numbers referred to as Target Telephone # 1 and Target Telephone # 2. 8/27/2020 Aff. In Support. Neither phone number was Mr. Persico's. The August 27, 2020 application neither targeted nor mentioned Mr. Persico. Nor did the Title III wiretap applications of September 23, 2020 and September 25, 2020.

The first of the Title III wiretap applications to mention Mr. Persico was dated October 26, 2020. Mr. Persico was not a target of the October 26, 2020 wiretap application, which was to continue to intercept telephone numbers referred to as Target Telephone # 1, Target Telephone # 3, and Target Telephone # 4—none of which were his.

However, in the course of interpreting a conversation intercepted on October 13, 2020 between Target Telephone # 3 and Target Telephone # 1, the deponent explained that he believed the declarant ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████[3]

On January 31, 2021, a federal agent submitted an Affidavit in Support of An Application to continue a Title III Wiretap on a telephone number referred to as Target Telephone # 3, and to

---

[2] Detention Memo p. 4 (listing six defendants, including Mr. Persico, whose telephone communications were intercepted during the investigation).
[3] 10/26/20 Aff. In Support Paragraph 60 (page 41, Bates Number RUSSOETAL000014552).

authorize an initial Title III Wiretap on a phone number referred to as Target Telephone # 6 ("1/31/21 Aff. In Support"). (Neither of these two phones was Mr. Persico's.)

The deponent averred that Mr. Persico ██████████████████████████████ ██████"[4] an allegation the Government subsequently retracted. Indictment ¶¶ 13, 18; Detention Memo p. 4 – 6. We also see this allegation in a Progress Report from the Government to Judge Broderick, dated 1/8/21, regarding interceptions pursuant to the Dec. 29, 2020 Order.[5] It was this admittedly false information of Persico being the boss that the Special Agent continuously relied on in all future Title III applications.

The Special Agent explained that the investigators believed that Mr. Persico had become the boss of the Colombo family based on information supplied by a Colombo family associate known as "CS-2." ██████████████████████████████ ██████████████████████████████████.[6]

The affiant averred that information from CS-2, ████████████████ ████████████████████████████████████████ ████████████████████████████████████,"[7]

There was no corroboration of CS-2's assertion that ████████████████ ████████████████████████. Nor did the affiant base his opinion that CS-2 was ████████ ██████████" on any prior prosecutions or any searches that were conducted. In all the Title III wiretap affidavits mentioning CS-2, there is not a single mention of CS-2 having been used as a source in any previous investigation.

---

[4] 1/31/21 Aff. In Support ¶ 64 (Bates # ending in 15877). See also Id. ¶¶ 65, 119.
[5] 1/8/21 Progress Report p. 6, Bates RUSSOETAL000015637 (████████████████████████ ████)
[6] 3/4/21 Aff. In Support ¶ 20, Footnote 7 (Bates number ending 17219).
[7] 1/31/21 Aff. In Support, Footnote 5 (Bates # ending in 15849).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

On February 19, 2021, an F.B.I. Special Agent submitted an Affidavit in Support of a continued Title III wiretap on what the application referred to as Target Telephone # 5.[8] ████

███████████████████████████████████████████████████

█████████████████████████████████

On March 4, 2021, the F.B.I. Special Agent submitted an Affidavit in Support of a continued Title III wiretap on what was referred to as Target Telephone # 3, and in support of an initial wiretap on a phone belonging to Mr. Persico, referred to as Target Telephone # 7.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Later in that affidavit, the Special Agent explained that the sole source of this allegation, CS-2:

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████ 3/4/21 Aff. In Support ¶ 117 (Bates ending 17285).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.”[9]

---

[8] Target Telephone # 5 not Mr. Persico's phone, either.

[9] 3/4/21 Aff. In Support ¶ 136. See also 10/26/20 Aff. In Support ¶ 88; 9/25/2020 Aff. In Support Paragraph 74; 12/29/2020 Aff. In Support Paragraphs 76 – 77.

As the deponent explained in the 3/4//21 Aff. in Support, 

. 3/4/21 Aff. In Support ¶ 100

). From this conclusion, the Government continued to falsely implicate Mr. Persico in a multitude of criminal activity.

The application for a wiretap on Mr. Persico's telephone was granted by Judge Broderick on March 4, 2021. Eavesdropping on Mr. Persico's phone lasted from March 4, 2021 to on or about April 2, 2021.

By April 8, 2021, an individual known as Co-Conspirator # 1("CC-1") began cooperating with investigators and making consensual recordings.

It appears that with the assistance of CC-1, the investigators and the Government finally learned that Mr. Persico had not, as they had been told, become the boss of the Colombo family.

Thus, the Indictment and the Detention Memorandum both allege that the lead co-defendant in this matter was the boss of the enterprise at all relevant times—as opposed to Mr. Persico. See e.g. Indictment Paragraph 13; Detention Memo at p. 4 – 6. The Indictment alleges that Mr. Persico held the ranks of captain and soldier in the enterprise—not boss. Indictment Paragraph 18.

There are no wiretap applications acknowledging the misinformation from CS-2 regarding Mr. Persico's alleged role in the hierarchy, a result of the Government ceasing to apply

for any Court authorized surveillance as of the start of CC-1's cooperation. Detention Memo p. 4 (no applications for wiretaps between April of 2021 and the arrest on September 14, 2021). This was obviously a result of an intent to avoid explaining to the Court how the Government had previously relied on false information.

We turn now from the Title III Wiretap Applications to the Arraignment.

III.    The Arraignment.

At the arraignment, Magistrate Judge Merkl acknowledged "that there's no specific acts of violence alleged as to Mr. Persico in this specific case." Arr. Tr. p. 38, L. 21 – 22.

The magistrate also acknowledged that the Government's "evidence as to [Mr. Persico's] involvement in the specific activities of the union could certainly be stronger. That could have been exculpated in the detention memo." Arr. Tr. p. 38, L. 4 - 6.

Stripped of the argument that Mr. Persico was the leader of the racketeering enterprise, the Government quietly changed tactics and retreated to the position that it had been decided that Mr. Persico's lead co-defendant will, at some unknown point in the future, eventually pass his leadership role onto Mr. Persico.

The Government never disclosed the misinformation from CS-2 at the Arraignment, nor had the Government disclosed the misinformation to the defense by the time of the Arraignment.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████.)

We will turn now to what the Government did proffer at the Arraignment—as well as evidence the Government did not mention.

A. November 2020 Meetings

The Government proffered evidence of two meetings in November of 2020 at the

████████████ Restaurant in Brooklyn, New York. According to the Government, one of these

meetings was on November 10, 2020 and the other on November 19, 2020. At the Arraignment,

the Government described (at least the November 10, 2020) meeting as one "among all of the

captains and senior administration of the Columbo crime family," Arr. Tr. p. 31, Lines 9 – 10.

The Government went a step further and claimed at the Arraignment that there was also evidence

that Mr. Persico attended the November 10, 2020 meeting. Arr. Tr. p. 25.

However, there is no allegation in the Detention Memo (or any of the Title III paperwork)

that there is <u>any</u> evidence that Mr. Persico attended the November 10, 2020 meeting. <u>See</u>

Detention Memo p. 10 (naming various co-defendants that law enforcement observed at said

meeting, but no observations or other evidence that would suggest Mr. Persico was there[10]). Law

enforcement conducted physical surveillance of both the November 10, 2020 and the November

19, 2020 meetings.

The Government conceded at the Arraignment that law enforcement did <u>not</u> observe Mr.

Persico during physical surveillance of the November 10, 2020 meeting. Arr. Tr. p. 29 Line 22.

However, the Government mistakenly said that there was physical surveillance of Mr. Persico

for the November 19, 2020 meeting. Arr. Tr. p. 32, Lines 16 – 17.



. Mr. Persico's name

---

[10] Contrary to the Government's argument, Arr. Tr. p. 29 – 30, the allegation that others made a decision concerning Mr. Persico at the November 10, 2020 meeting does not constitute proof of having attended that meeting.

does not appear on that list. ██████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████.[11] Nor does Mr. Persico appear in any of the surveillance from

November 19, 2020 provided in discovery.

According to the Detention Memo, evidence that Mr. Persico attended the November 19,

2020 meeting included license plate readers and cell-site location information. Detention Memo

at 10. At the Arraignment, the Government elaborated that license plate readers confirmed that

Mr. Persico's vehicle traveled from Staten Island to Brooklyn before the November 19, 2020

meeting started and left Brooklyn once the November 19, 2020 meeting ended. Arr. Tr. p. 32,

Lines 16 – 21. See also 3/4/21 Aff. In Support Paragraph 86.

In doing so, the Government did not mention at the Arraignment, nor did the affiant

mention, that the Verrazzano Bridge is approximately 9 miles away from the restaurant where

the meeting allegedly took place.[12]

The Government did not argue that there was any evidence from license plate readers that

Mr. Persico attended the November 10, 2020 meeting.

This is because the evidence proves that *Mr. Persico was in Staten Island when the*

*November 10, 2020 meeting took place in Brooklyn*—which the Government did not disclose at

the Arraignment. The data from New York Police Department license plate readers subsequently

---

[11] 3/4/21 Aff. In Support ¶ 86, RUSSOETAL000017257.

[12] Google Maps Directions from restaurant to Verrazzano Bridge, available at:
https://www.google.com/maps/dir/████████████████████████████+Brooklyn,+NY
+11229/Verrazzano-Narrows+Bridge,+New+York,+NY/@40.5982013,-
74.0232236,13z/data=!3m1!4b1!4m14!4m13!1m5!1m1!1s0x89c24484a6731d21:0xfdce2b16beb
5afe0!2m2!1d-
73.9421015!2d40.6002938!1m5!1m1!1s0x89c24f9e2ed21dc7:0x2b64f7967b90015f!2m2!1d-
74.0449291!2d40.6065756!3e0 (visited on March 1, 2022).

provided by the Government confirms that on November 10, 2020, Mr. Persico crossed the Verrazzano Bridge into Staten Island on his way to work at approximately 9:07 a.m., and left Staten Island after work at 5:38 p.m.[13] (At the same time that the Government failed to disclose this information, the Government relied upon license plate reader data as evidence of Mr. Persico's presence at the Brooklyn restaurant on November 19, 2020.)

Mr. Persico's E-ZPass records for November of 2020 confirm that Mr. Persico's vehicle traveled from Brooklyn to Staten Island via the Verrazzano Bridge at 9:07 a.m. on November 10, 2020.

The defense is in possession of Mr. Persico's cell phone records for November of 2020, which indicate that between the hours of 9:12 a.m. on November 10, 2020 and 5:15 p.m. on November 10, 2020, all of Mr. Persico's mobile calls were made from <u>Staten Island</u>. Additionally, cell-site location information for November 2020 would corroborate that Mr. Persico was <u>in Staten Island</u> when the (allegedly important) November 10, 2020 meeting took place in <u>Brooklyn</u>.



[14]

---

[13] NYPD License Plate Reader data, Bates # ending in 6644.
[14] 3/4/21 Aff. In Support Paragraphs 79 – 90.

11

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

The Government argued that there was other evidence that Mr. Persico had attended both meetings. [REDACTED]

[REDACTED]

[REDACTED] 3/4/21 Aff. In Support ¶ 87. [REDACTED]

[REDACTED]

[REDACTED]

The Special Agent submits this assumption while he should have known that, to the contrary, Mr. Persico was previously alleged to go by the alias "Skinny." [REDACTED]

[REDACTED] See Indictment presented by the E.D.N.Y. U.S. Attorney's Office in 2010 in *U.S. v. Bombino et al*, 10 CR 147 (caption stating "also known as 'Skinny' and 'Teddy'").

We turn now from the two November 2020 meetings to evidence the Government proffered of other alleged incidents.

B. <u>March and April of 2021</u>

The Detention Memo relied upon the March 29, 2021 meeting alleged in Overt Act (g) of Count 14 of the Indictment. According to the Detention Memo, a telephone conversation was intercepted on March 29, 2021 wherein Mr. Persico mentioned he was going to go to Long Island, and the other person on the call (another alleged captain), said that he would go, as well. Detention Memo p. 37. Thereafter, the Detention Memo states, GPS location information for Mr.

Persico's cell phone, plus physical surveillance by law enforcement show that Mr. Persico went to the lead co-defendant's residence.[15]

(The lead co-defendant, whom Mr. Persico allegedly visited on March 29, 2021, was released on bond on October 29, 2021. Bond for the alleged captain on the other end of the March 29, 2021 telephone conversation was approved on January 7, 2022.)

According to the Detention Memo, three co-defendants then went to visit Mr. Persico at Mr. Persico's place of business (a body shop) on April 1, 2021. Detention Memo p. 34.

The Government argued at the Arraignment that the two meetings on March 29, 2021 and April 1, 2021 came at a "critical time" during the charged Extortion Scheme, and was evidence that Mr. Persico should be detained. Arr. Tr. p. 26, 34.

Defense counsel retorted that there had been no proffer of any reason to believe that these meetings occurred at a "critical time" in a scheme that allegedly spanned two decades[16]: "they have a lot of sources of information. Why is April 1st, 2021 such a critical point and what is the information that's based on… because I don't see that in the detention memo, either." Arr. Tr. p. 35, Lines 21 – 25.

The Government responded (in part), that during recordings, one of the co-defendants who allegedly went to Mr. Persico's place of business on April 1, 2021, "repeatedly referenc[ed] what the direction he's receiving from the administration is," Arr. Tr. p. 36, Lines 22 – 23. More

---

[15] Mr. Persico and the lead co-defendant are related. 3/4/21 Aff. In Support ¶ 25. No mention was made, in the Detention Memo or at the Arraignment, of a conversation recorded on February 20, 2021 in which the lead co-defendant said ██████████ to Mr. Persico, who ████████████████████████████████ ." 3/4/21 Aff. in Support ¶ 107, p. 72 – 73. In turn, the lead co-defendant stated ████████████████████████████ Id.

[16] Indictment ¶¶ 23 – 24 (Extortion Scheme spanned "from approximately 2001 to the date of this Indictment").

specifically, the Government argued that said co-defendant had gone to Mr. Persico for direction. Arr. Tr. p. 36 Lines 15 – 18.

Thus, we see that even at the arraignment on September 14, 2021, the Government continued to argue that references in recordings to the enterprise's "administration" referred to Mr. Persico. Arraignment Tr. p. 36, L. 17 – 23. So, too, the Detention Memo lumps Mr. Persico in with the "administration" of the Colombo organization. Detention Memo p. 7.

The problem with assuming that conversations regarding the administration were regarding Mr. Persico is that, according to the Indictment, Mr. Persico was never a member of the administration. The "administration," of a racketeering enterprise, as explained in the Indictment, consists of a boss, an underboss, and a consigliere.[17] Three of Mr. Persico's co-defendants were allegedly the boss, underboss, and consigliere of the Colombo racketeering enterprise. Indictment Paragraphs 13, 14, and 16.

Aside from the Government improperly arguing that Mr. Persico was part of the administration, there is another problem with the Government's argument that Mr. Persico gave instructions to a co-defendant at a meeting on April 1, 2021. ██████████████ ████████████████████████████████████████████████████████ █████████████████████████████ ████████████████████████████████████ █████████████████████████████ (A question CC-1 asked in an attempt to gain information that would implicate Mr. Persico, whom he referred to as ████████████████.") ████████████████████████████████████████████████████ ████████████████████

---

[17] Indictment Paragraph 4.

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

We turn now from the alleged meetings on March 29, 2021 and April 1, 2021 to a conversation intercepted in July of 2021.

### C. July 20, 2021 Conversation.

In the Detention Memo, the Government relied upon a conversation recorded on July 20, 2021, between CC-1 and a co-defendant. The Detention Memo quoted an excerpt of the July 20, 2021 conversation, wherein CC-1 asked about "what protection do we have *if* the other guy takes over?", and the co-defendant opined "when he takes? It's smooth sailing," Detention Memo p. 13 (emphasis added).

The Government explained in the Detention Memorandum that they interpret the July 20, 2021 conversation to mean that the co-defendant in question "believed that Persico *would be* very supportive of [his] and others operation of the Labor Union and Health Fund." Detention Memo p. 13 (emphasis added).

Defense counsel addressed the July 20, 2021 conversation at the arraignment: "the government concedes that it's a very speculative conversation. It's a conversation that's talking about things that may happen in the future, may not happen in the future. If Mr. Persico was truly involved in any conspiracy, if Mr. Persico was even aware of anything, no one would be speaking in terms of speculation for the future, maybe he would be supportive, maybe he would not." Arr. Tr. p. 17, Lines 6 – 14.

According to the Detention Memo, the same July 20, 2021 conversation indicated that the co-defendant believed a crew would have an "easier time" **if** Mr. Persico took over the

racketeering enterprise.[18] Although the Detention Memo quoted excerpts from this conversation at p. 12 - 13, the Detention Memo neglected to mention the part where the co-defendant elaborated that ███████████████████████████████████████████████████ ███████████████████████████████████████

Ultimately, without the benefit of all of the evidence that we now have from discovery, the magistrate ordered Mr. Persico's detention, in light of his criminal history and the allegations of his role in the enterprise, and of his associating with other members of the enterprise during the time period of the Indictment, which would violate the terms of his supervised release. Arr. Tr. p. 37 – 41. We submit there is a likelihood of a different decision were all the evidence available at that time. Since then, the defense has received discovery and we prepared for trial.

Mr. Persico is the only defendant who is currently requesting a Speedy Trial.[19] In opposition, the Government argued that Mr. Persico's co-defendants are not seeking a speedy trial.[20] Unlike the majority of his co-defendants, who have been released on bail, Mr. Persico is still detained pending trial. His interest in having a Speedy Trial thus differs significantly from the majority of his co-defendants.

---

[18] Detention Memo p. 13.

[19] Letter Motion dated December 13, 2021 (ECF # 155) requesting Court set a trial date for mid-2022 and objecting to designation of matter as a complex case; Letter Motion dated February 18, 2022 (ECF # 229), requesting the Court set a November 2022 trial date and demanding outstanding R. 16 discovery.

[20] See, e.g. Gov's Response to Persico's Request for Trial Date, dated December 15, 2021 (ECF # 165), p. 3 (arguing setting trial date premature because "several defendants agreed to exclude time under the Speedy Trial Act in order to engage in plea negotiations").

Of the 14 defendants charged, 10 have already been granted bail, including the alleged

boss, underboss[21] and consigliere, another three co-defendants who were subjects of the

Detention Memo, and another four co-defendants who were not targeted in the Detention Memo.

Still another co-defendant, it appears, has thus far not been able to satisfy the necessary

conditions to be released.

## DISCUSSION

I.     The Bail Reform Act.

Under the Bail Reform Act, a defendant is to be released on bail pending trial unless

there is no possible combination of conditions that would reasonably assure his appearances at

court and the safety of the community. 18 U.S.C. § 3142(e)(1). The Court is to analyze a number

of factors in determining whether any such combination of conditions exists, including: (1) the

nature of the offense charged; (2) the weight of the evidence against the person; (3) the history

and characteristics of the person; and (4) the nature and seriousness of the danger to any person

or the community that would be posed. 18 U.S.C. § 3142(g).

This inquiry is "a fact-intensive analysis of the quality and quantity of the evidence

produced at the bail hearing," *United States v. Ciccone*, 312 F.3d 535, 543 (2d Cir. 2002).

"[W]hether presented by proffer or direct evidence, courts retain the responsibility for assessing

the accuracy of the Government's proof," *United States v. Enix*, 209 F. Supp. 3d 557, 573

(W.D.N.Y. 2016) (quoting *United States v. Goba*, 240 F. Supp. 2d 242, 247 [W.D.N.Y. 2003])

(finding that the Government had not demonstrated dangerousness by clear and convincing

evidence where the Government was relying on unsworn statements without any "wiretap or

---

[21] Redacted Order Setting Conditions of Release, ECF # 254, filed March 9, 2022. See also
Gov's Response to Second Motion for Bond, ECF # 251 (indicating no opposition to that
application).

surveillance evidence in this case, or any other type of corroborating evidence presented to the Court," 209 F. Supp. 3d at 572).

We acknowledge that Mr. Persico has a significant criminal history and was on supervised release during the relevant time period.

However, the Bail Reform Act does <u>not</u> require that a defendant be an inherently trustworthy individual in order to grant bail. Rather, the relevant question is whether there exist <u>any</u> potential external conditions that would reasonably assure the safety of the community and the defendant's return to court; if so, the next question becomes which of those are the least restrictive conditions necessary to satisfy those twin goals. "The Court rejects the Government's proposition that the setting of bail conditions is 'based, fundamentally, on the trustworthiness of the defendant.' … Indeed, *implicit in the bail condition analysis is the assumption that the defendant cannot be trusted on his own…* [Conditions of release] are designed for situations in which the Court has determined that additional safeguards are necessary to control the defendant." **United States v. Madoff**, 586 F. Supp. 2d 240, 255 (S.D.N.Y. 2009) (emphasis added) (imposing additional conditions of release on Bernie Madoff rather than revoking his pre-trial release for dissipating assets).

II.    <u>The Proposed Bail Package.</u>[22]

Mr. Persico respectfully submits that the safety of the community and his return to Court would both be reasonably assured by bail in the amount of $ 5 million, plus the following conditions of release:

---

[22] The Government has informed us that the prosecution will not consent to any bail package or combination of conditions of release. Though the Government did suggest they would not have completely ruled out the possibility of consenting to bail had Mr. Persico been in poor health.

- Home incarceration, with location monitoring, except for attorney visits, Court appearances, and any necessary medical treatment;

- Surrender of any passport and no new applications;

- Strict pre-trial supervision;

- Travel restricted to within the E.D.N.Y. and S.D.N.Y.;

- No contact with any known victims, witnesses, or potential witnesses;

- No contact with any co-defendants except in the presence of an attorney;

- No contact with any known members or associates of organized crime;

- No phone usage except to or from an attorney, and then only on a phone to be subject to Pretrial/cyber monitoring;

- Electronic devices in the home to be limited to those to be disclosed to Pretrial Services and all electronic devices in the home may be monitored by Pretrial Services and searched by the Government.

Mr. Persico proposes that the bond be partially secured[23] by six properties, and co-signed by 10 individuals (and one LLC) as follows:[24]

| RELATION | OCCUPATION | ESTIMATED NET EQUITY IN PROPERTY[25] |
|----------|------------|--------------------------------------|
| Defendant's Mother | Bus Matron | $ 643,418.29 |
| Defendant's Friends | A Landlord/ Retired Firefighter and the head of a Human Resources department. | $ 373,172.60 |

---

[23] We note that at least two co-defendants had bonds partially secured by properties. For instance, although the lead co-defendant's bond was set in the amount of $ 10 million, the properties securing the bond were worth $ 7 million. Transcript of Bond Hearing of Lead Co-Defendant on 10/27/21, p. 37, Lines 5 – 8. The alleged consigliere's bond was set in the amount of $ 5 million, but partially secured by properties worth $ 2,440,515. ECF # 216 Exhibit A – Bail Proposal.
[24] Although, at the Arraignment, defense counsel proffered that the defendant would be able to put together a substantial bail package, at that time, the defense had not yet gathered information from potential sureties.
[25] Unless stated otherwise, net equities are based on estimates (e.g. from Zillow, Realtor, and Redfin) of the properties' market value, less outstanding principal on mortgages, except as to those properties that have no mortgages.

| Family Friend/former partner of Daniel Persico[26] | Hotel Owner | $ 1,462,600 |
| Parents of Mr. Persico's fiancée | Fiancée's father is a P/T court officer and armed security guard and a retired police lieutenant;<br>Fiancée's mother works part time for the Woodbridge Board of Education | $ 262,386.11 |
| Mr. Persico's brother and cousin | Self-employed | $ 1,500,000[27] |
| Defendant's friends | Former Auto-Parts Store Owner, now works for S.I. University Hospital, and a homemaker. | $ 322,289.49 |
| **Total:** | | **$ 4,563,866.49** |

III. <u>The Conditions of Release Would Reasonably Assure The Safety of the Community.</u>

In the case at bar, the Government argued (and the magistrate agreed at the Arraignment) that Mr. Persico should be detained due to posing a danger to the community. No issue was raised concerning risk of flight.

Although defense counsel attacked the strength of the Government's case during the Arraignment, and the magistrate acknowledged at the arraignment that the Government's evidence could have been stronger, the weaknesses in the prosecution's case have since become more evident.

The Government's argument at the Arraignment that Mr. Persico is too dangerous to be released hinged on the level of influence that Mr. Persico allegedly had over others in the

[26] Residence is owned by and is the sole asset of Shore Road Holdings, LLC; the president of Shore Road Holdings, LLC resides in the home. Therefore, we propose both Shore Road Holdings, LLC and its president as potential suretors.
[27] Property appraised by Berardi Realty. The lower end of the appraisal, dated March 9, 2022, puts the property's fair market value at $ 1.5 million. There is no mortgage on the property.

racketeering enterprise. There is no dispute that he is not accused of any violent offenses in the case at bar.



Yet there was no indication that CS-2's information had been relied upon in previous investigations, for example, to obtain search warrants or Title III applications.

---

[28] Not a single Title III wiretap application was submitted in this matter once the F.B.I. discovered the falsity of CS-2's information. Call us cynical, but it seems to us that the federal agents preferred to give up one of the investigative tools in their arsenal rather than have to concede that their information was wrong. And we wonder if a concern about saving face also explains why the Government delayed disclosing the Title III wiretaps to the defense until four months after Mr. Persico's arraignment.

[29] 3/4/21 Aff. In Support, Footnote 5, Bates RUSSOETAL000017217.

was no more reliable than a rumor and, like all unverified gossip, should have been treated with inherent suspicion.

These facts make the Special Agent's assertions even more speculative.

? And if so, what is the basis of the information provided to the Court?

[34]

---

[30] See e.g. 10/26/2020 Aff. In Support Paragraph 88.
[31] 3/4/21Aff. In Support Paragraph 20 and Footnote 7.
[32] 10/26/20 Aff. In Support Paragraph 60.
[33] 3/4/21 Aff. In Support Paragraph 20 and Footnote 7.
[34] 10/26/20 Aff. In Support Paragraph 15.



At any rate, the Government has since realized that the rumor of Mr. Persico's ascension was false. Indictment Paragraphs 13, 18; Detention Memo, p. 4 - 6. But by the time that this error came to light, the damage had already been done.

The misinformation had already colored the F.B.I.'s and the Government's interpretation of the evidence. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████ ████████████████████

█████████████████████████████████████

█████████████████████

Even at the Arraignment—by which time the Government *knew* that Mr. Persico was not part of the administration of the Colombo racketeering enterprise, as defined in the Indictment— the Government persisted in this fallacy.

---

[35] 10/26/20 Aff. In Support Paragraph 14.
[36] 3/4/21 Aff. In Support Paragraph 100.

We see this in how the Government continued to argue at the Arraignment that evidence that a co-defendant received direction from the enterprise's *administration* constituted evidence of *Mr. Persico*'s involvement in giving directives to others. Arr. Tr. p. 36.

Now armed with what we believe is the majority of the Rule 16 Discovery, we submit that the reality is that to this day, the Government continues to overstate Mr. Persico's role in the enterprise. Just as the F.B.I.'s informant saw a boss where there was none, so, too, we submit the Government sees orders that were never given by Mr. Persico.

As proof of Mr. Persico's supposedly high-ranking status in the enterprise, at the Arraignment, the Government alleged that Mr. Persico had been to not one, but two meetings in November of 2020: one on November 10, 2020 and one on November 19, 2020.

This was a mistake. The Government erroneously stated at the Arraignment that there was physical surveillance of Mr. Persico at the November 19, 2020 meeting. Arr. Tr. p. 32, Lines 16 – 17. In fact, there was no physical surveillance of Mr. Persico at either of the November 2020 meetings.[37]

Referring specifically to the November 10, 2020 meeting, the Government said at the Arraignment that "it's evident from the nature of a meeting among all of the captains and senior administration of the Columbo crime family exactly what type of conduct would be discussed at a meeting like this. The fact that Mr. Persico was shown to be *at that meeting* through a number of pieces of information, (ui) and the like, is further *evidence of the strength of the government's case* here." Arraignment Tr. p. 31, L. 8 – 15 (emphasis added).

---

[37] 3/4/21 Aff. In Support Paragraph 86 ███████████████████████████████
███████████████: 1/31/21 Aff. In Support Paragraph 100 ████████████████
██████████████████████████████████████████████████████████ .

By that same logic, we submit that the fact that there are actually a number of pieces of evidence showing that Mr. Persico *was in a different borough* at the time of the November 10, 2020 meeting is further evidence of the holes in the Government's case.

The magistrate was never informed of evidence proving that Mr. Persico was not even in the same borough when the November 10, 2020 meeting took place. The Government failed to mention at the Arraignment that NYPD License Plate Reader evidence (since provided by the Government in discovery), shows that Mr. Persico crossed the Verrazzano Bridge into Staten Island (where he works), shortly after 9 a.m. on November 10, 2020, and that he left Staten Island at 5:38 p.m.[38] Thus, he was in Staten Island during the time that the November 10, 2020 meeting took place in Brooklyn.

Additionally, Mr. Persico's E-ZPass records and cell phone records for November of 2020, both in defense counsel's possession, corroborate that Mr. Persico was in Staten Island during the hours when the November 10, 2020 meeting was being held in Brooklyn. And cell site location information would also corroborate that Mr. Persico was in ***Staten Island*** when the allegedly important November 10, 2020 meeting took place in ***Brooklyn.***

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

---

[38] License Plate Reader data Bates # Ending 6644.

██████████████████████████████████████████████████
████████████████████████. Namely, as the Government should already be aware, one of Mr. Persico's aliases is "Skinny." <u>See</u> Indictment, *U.S. v. Bombino et al*, 10 CR 147.

Considering the Government's earlier assertion that Mr. Persico is also known as "Skinny," ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████?

We acknowledge that the Government also proffered, as evidence that Mr. Persico attended the November 19, 2020 meeting, that his vehicle traveled from Staten Island to Brooklyn before the meeting began and left Brooklyn after the meeting. However, the Government omitted the fact that the Verrazzano-Narrows Bridge is miles away from █████████ ███ restaurant, where the meeting is alleged to have taken place.[39] Proof that Mr. Persico was crossing the Verrazzano-Narrows Bridge is therefore insufficient to prove that Mr. Persico was at the restaurant on November 19, 2020.

For all the months of investigation and all the tools that were used, including wiretaps, confidential sources, physical surveillance by law enforcement and consensual recordings, the Government's case against Mr. Persico still boils down to one thing—guilt by association. In the absence of any direct proof that Mr. Persico gave any orders as part of the charged conspiracies or otherwise participated in the Extortion Scheme and Money Laundering Scheme charged in the case at bar, the Government's case comes down to evidence that Mr. Persico allegedly met with and spoke with co-defendants.

---

[39] Specifically, the restaurant is 9 miles away from the bridge according to Google Maps (visited March 1, 2022).

One of the very conversations the Government relied upon as alleged proof of Mr. Persico's involvement in the case at bar actually indicates that he was <u>not</u> a part of the Extortion Scheme or the Money Laundering Scheme. The Government said in their Detention Memo that the July 20, 2021 conversation between CC-1 and a co-defendant meant that Mr. Persico "*would be* very supportive" of the alleged Extortion Scheme. Detention Memo p. 13 (emphasis added).

The Government did not disclose in the Detention Memo or at the Arraignment the co-defendant's explanation of this opinion. In the July 20, 2021 conversation, the co-defendant advised that Mr. Persico ███████████████████████████████████████████████ ████████████████████████████████████████ July 20, 2021 Conversation.

Further, the tense used by the Government in the Detention Memo ("would be") indicates that as of the date of the recorded conversation, Mr. Persico was not then involved in the Extortion Scheme, let alone giving any orders to co-defendants in furtherance of the Extortion Scheme or related Money Laundering Scheme. Arr. Tr. p 17, Lines 6 – 14.

This also negates the Government's argument that Mr. Persico was giving any orders in furtherance of the Extortion Scheme or Money Laundering Scheme when co-defendants went to visit him on April 1, 2021, as the April 1, 2021 visit *pre-dates* the July 20, 2021 conversation that indicated that Mr. Persico was not involved in the charged Extortion or Money Laundering Schemes. So too, the March 29, 2021 alleged meeting at the lead co-defendant's home pre-dates the July 20, 2021 conversation.

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████

In sum, upon review of all of the evidence that we now have, counsel's professional opinion is that Mr. Persico's case is quite defensible and the defense is ready for trial. The Government is still allowing what is now known to be false information from CS-2 to color their argument regarding Mr. Persico's place in the hierarchy of the racketeering enterprise. On multiple occasions, the Government has conceded that the volume of evidence against Mr. Persico is significantly less than the evidence the Government has against some of his co-defendants, including co-defendants who have already been released on bail.

And we would like to know if the Government will seriously contend that Mr. Persico is somehow more dangerous or would have a greater level of influence over the racketeering enterprise than, say, the alleged boss, alleged consigliere, and alleged underboss of the enterprise, all three of whom have already been released on bond.[40]

We submit then, given the weaknesses in the Government's case, given that they continue to overestimate his status in the racketeering enterprise, the proposed restrictions and bond package will be sufficient to assure the safety of the community as well as Mr. Persico's return to Court.

---

[40] Three of the other subjects of the Government's Detention Memo and four other co-defendants have also been released on bond.

Turning to another factor, there is more to the history and characteristics of the defendant than his criminal history. Mr. Persico's fiancée, Nicole Russo, has significant health issues. Prior to his arrest, Mr. Persico would assist his fiancée. For example, he would take Ms. Russo to her doctor's appointments and medical treatments, and would also help her out during her convalescence at home. See Letter from Nicole Russo (attached). Ms. Russo explains that "I am finding it challenging to withstand taking care of myself, my mother who is also sick… run a business… I desperately need Theodore's help and support." Letter from Nicole Russo (attached).

If this application is granted, Mr. Persico would be on home detention. He would be residing with his fiancée, Nicole Russo, in their shared apartment, located at: ███████████, Brooklyn, New York ████. (It is a two family house. Prior to his arrest, Mr. Persico lived there with Ms. Russo.)

Ms. Russo owns and operates a business, Vintage Collision, Inc. Vintage Collision is the owner of the body shop in Staten Island where Mr. Persico was employed prior to his arrest. Ms. Russo works at the body shop on a regular basis and, prior to his arrest, so did Mr. Persico.

We do understand that the alleged violations of Mr. Persico's supervised release may be of some concern to the Court. But we assure the Court that Mr. Persico would obey the conditions of pretrial release so as to avoid jeopardizing the homes or the livelihoods of the proposed suretors, including but not limited to his mother, his brother, his cousin, and his prospective in-laws. Finally, we note that the conditions of pretrial release proposed herein would provide substantially greater external controls than the conditions of his supervised release.

## CONCLUSION

WHEREFORE, Mr. Persico respectfully requests that bail be set in the amount of $ 5 million, partially secured by six properties (with a combined net equity of approximately $ 4.56 million), with the following conditions of release:

- Home incarceration, with location monitoring, except for attorney visits, Court appearances, and any necessary medical treatment;

- Surrender of any passport and no new applications;

- Strict pre-trial supervision;

- Travel restricted to within the E.D.N.Y. and S.D.N.Y.;

- No contact with any known victims, witnesses, or potential witnesses;

- No contact with any co-defendants except in the presence of an attorney;

- No contact with any known members or associates of organized crime;

- No phone usage except to or from an attorney, and then only on a phone to be subject to Pretrial/cyber monitoring;

- Electronic devices in the home to be limited to those to be disclosed to Pretrial Services and all electronic devices in the home may be monitored by Pretrial Services and searched by the Government.

Respectfully submitted,

Dated: March 11, 2022 /s/ *Joseph R. Corozzo*
JOSEPH R. COROZZO
Rubinstein & Corozzo, LLP
*Attorneys for Defendant Theodore Persico*
260 Madison Avenue, 22nd Fl. NY, NY 10016
Ph. (212) 545-8777, Fax (917) 722-8206
Angela D. Lipsman, Esq. On the Memorandum

cc: AUSAs Devon Lash and James McDonald (via email)