UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
UNITED STATES OF AMERICA         :

                                           21 CR 466 (HG) (JRC)

       -against-                   :

THEODORE PERSICO            :

                                   :
-------------------------------------------------------------------------X

## DEFENDANT THEODORE PERSICO'S
## SENTENCING MEMORANDUM

Joseph R. Corozzo
Angela D. Lipsman
Rubinstein & Corozzo, LLP
*Attorneys for Defendant*
*Theodore Persico*
260 Madison Avenue, 22d Fl.
New York, New York 10016
(212) 545-8777 (ph)
(917) 722-8206 (fax)
jcorozzo@rubcorlaw.com
alipsman@rubcorlaw.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 3

FACTUAL BACKGROUND ................................................................................................. 3

DISCUSSION .................................................................................................................... 11

   I. The PSR Overstates the Extent of the Applicable Aggravating Role Enhancement............. 11

   II. A Non-Guidelines Sentence Is Sufficient But Not Greater Than Necessary........................ 18

      A. Devotion to Fiancée and Other Loved Ones. ................................................................. 21

      B. Conditions at the MDC. ................................................................................................. 23

      C. Giving Back to the Community. ..................................................................................... 29

      D. The Need to Avoid Unwarranted Disparities With Similarly Situated Defendants. ....... 30

      E.   The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law,
and to Provide Just Punishment for the Offense ................................................................... 31

      F. The Need to Protect the Public from Further Crimes of the Defendant. .......................... 32

CONCLUSION ................................................................................................................... 33

## PRELIMINARY STATEMENT

This memorandum of law is being submitted on behalf of Defendant Theodore Persico (hereafter "Persico"), who is scheduled to be sentenced on December 15, 2023.

As we will explain, a below Guidelines sentence would be sufficient but not greater than necessary.


## FACTUAL BACKGROUND

On July 12, 2023, Mr. Persico pled guilty to Count 1 of the Superseding Indictment: Racketeering, in violation of 18 U.S.C. § 1962(c), and admitted to his participation in an extortion conspiracy (Racketeering Act 1) and a money laundering conspiracy (Racketeering Act 6).

Beginning in approximately 2001, two of Mr. Persico's co-defendants began extorting a Labor Union and a senior official in the Labor Union ("John Doe #1").[1] (These two co-defendants have also pled guilty. One of them was sentenced to a below guidelines sentence of 28 months imprisonment. The other has not yet been sentenced.)

According to the Indictment, one of these two co-defendants ("Co-Defendant 1") was an associate of the Colombo racketeering enterprise,[2] and the other was a captain within the enterprise. Id.¶ 20. The Indictment also charges that Mr. Persico was a captain and soldier within the enterprise. Id. ¶ 18.

From 2001 to 2021 (including, as the Government pointed out, throughout the COVID-19 pandemic),[3] John Doe # 1 was coerced into paying a portion of his salary to conspirators for

---

[1] Superseding Indictment ¶¶ 23 – 24.
[2] Superseding Indictment ¶ 19.
[3] Gov's Sentencing Submission, ECF # 472, p. 3 – 4.

the benefit of Co-Defendant 1, who alleged that these payments were his pension from the Labor Union. Superseding Indictment ¶ 24.

Mr. Persico's co-defendants used implied threats of force and violence to extort John Doe # 1 and the Labor Union, for example, by texting John Doe # 1 on April 2, 2020, "this is the 2nd text, there isnt going to be a 3rd." Gov's Sentencing Submission, ECF # 472, p. 2; PSR ¶ 37.

According to the Government, "[t]he extortion schemes… in this case evolved over time, beginning with obtaining monthly payments from the salary of John Doe #1 and then, later, attempting to force John Doe #1 to make decisions within … (the 'Labor Union') that benefitted the Colombo crime family; manipulating the selection of an employee welfare benefit plan's ('Health Fund') vendors… and seeking to divert [funds] from the Health Fund's assets," Gov's Sentencing Submission, ECF # 472, p. 2.

Defendants conspired to launder funds from the extortion of the Labor Union as extortion payments were made in cash to conceal the origins and control of the funds.[4]

On May 29, 2020, Mr. Persico was released from prison and began the supervised release portion of his sentence from United States v. Bombino et. al., 10 CR 147, a matter which has since been reassigned to this Court.[5]

---

[4] PSR ¶ 173, setting forth Defendant's Allocution.

[5] Mr. Persico was charged with violations of his supervised release in Bombino related to his conduct in the case at bar. As part of his plea agreement in the case at bar, the Government will move to dismiss the VOSR proceeding in Bombino at sentencing. Despite the overlap between the VOSR charges and the offense conduct herein, nothing in this memorandum should be construed as an admission of guilt to the VOSR charges. Though, since Mr. Persico's arrest, he has already been incarcerated for more than twice the term of imprisonment that Probation's VOSR Report recommended for the alleged violations.

Mr. Persico joined the extortion and money laundering conspiracies after his release from prison. He had no involvement with or knowledge of the conspiracies prior to his release from prison in May of 2020.

However, following his release from prison in late May 2020, members of the enterprise kept Mr. Persico informed of the ongoing extortion and money laundering schemes. PSR ¶ 153.

During the course of these updates on the ongoing conspiracies, Mr. Persico indicated he would not interfere with his co-conspirators' actions. He demonstrated this support for the conspiracies by agreeing that his co-conspirators could continue their decades' long extortion of John Doe # 1 and the more recent extortion of the Labor Union without having to worry that Mr. Persico would intervene in any manner (whether to put a stop to the ongoing offenses or otherwise).

Specifically, Mr. Persico's support for the conspiracies is encapsulated in the words of one co-defendant ("Co-Defendant 2") during a conversation on July 20, 2021. In this conversation, Co-Defendant 2, who, according to the Government, "played an integral role in supervising the Colombo family's attempt to penetrate the Labor Union,"[6] summarized an encounter with Mr. Persico as follows:

"'I told him [Persico] everything's running smooth. No problem, **he says do whatever youse have to do. He don't care** about nothing, he just wants to go out… have a good time, the guy spent 30 fucking years in jail already, he's only 57, he's just… I'm good with it, you know, he's not selfish, he's not gonna be greedy, he's not gonna say I'm entitled to…'" Government's Opp. to Motion, ECF # 429, p. 6 (quoting co-defendant) (emphasis added).

---

[6] Gov's Sentencing Submission, ECF # 531, p. 3.

Based upon his stated position, the conspirators believed that **if** in the future Mr. Persico would get involved in this activity,[7] the conspirators would then "have an easier time with pressure from the administration of the Colombo crime family," PSR ¶ 99, i.e. he would not interfere in the collection and distribution of proceeds.[8]

Contrary to the PSR's allegations that Mr. Persico gave orders to others during the course of the schemes or that he allegedly delegated matters to a person who, per the Indictment, was higher ranked than Mr. Persico,[9] Mr. Persico did not control any participants in the schemes and did not give any more specific directive to any of the co-conspirators than the aforementioned "No problem… do whatever youse have to do." (We respectfully submit that Mr. Persico had no more ability to delegate tasks to a higher ranked member of the enterprise than an Assistant United States Attorney could delegate tasks to U.S. Attorney Breon Peace, or than a law firm associate could delegate work to a law firm partner. That is just not how hierarchies work. Just as a Court of Appeals has authority over District Courts, the individual that Mr. Persico allegedly

---

[7] The Government has referred to Mr. Persico as the "heir apparent," Government's Opp. to Motion, ECF # 429, p. 6. While we dispute this assertion, whether or not Mr. Persico was in line for a promotion within the criminal organization, and who was next in line of succession is irrelevant to questions of relevant offense conduct and role in the offense.

[8] The phrasing of this should have made it obvious that Mr. Persico had never actually ascended to the administration of the racketeering enterprise. We have objected to the PSR's and the Government's allegations that Mr. Persico was part of the administration. By the Government's own definition, a captain cannot constitute a member of the administration. Indictment ¶ 4 ("the boss, the underboss and consigliere were the crime family's 'administration'"). We attribute the Government's insistence to the contrary to a form of confirmation bias, a phenomena wherein persons are naturally predisposed to interpret new information in a way that fits preexisting beliefs. Here, the preexisting belief was the misinformation adopted by the Government during the investigation (and since abandoned) that Mr. Persico had risen to the boss of the enterprise. See Defendant's Pretrial Motions p. 18 – 22, ECF # 378 (internal citations omitted). Despite the Government abandoning this misconception, the effect of the misinformation is ongoing as it nonetheless permanently colored investigators' and the Government's interpretation of the evidence as it relates to Mr. Persico.

[9] PSR ¶¶ 76, 153; Indictment ¶ 14.

delegated a matter to would have had authority over Mr. Persico, <u>not</u> the other way around. The Government's alleged evidence of a delegation to a higher ranked individual is, we submit, no more reliable than the misinformation received by the Government that erroneously reported that Mr. Persico was boss of the enterprise.)

The extortion scheme, which is discussed in more detail in the PSR, included the racketeering enterprise's placement of Co-Conspirator 1 inside the Labor Union's United Benefit Fund as an assistant administrator. PSR ¶¶ 57 – 58. Thus, Co-Conspirator 1 regularly met with active participants in the extortion scheme in Brooklyn (without Mr. Persico) and was kept informed as to who was participating in the scheme, who was supervising it, and what decisions were being made. Unbeknownst to the conspirators at the time, Co-Conspirator 1 was a Government informant and wore a wire beginning in April of 2021 and through the end of the investigation in September of 2021. Co-Conspirator 1 thus provided critical evidence as to the operation of the extortion scheme and the culpability of various participants.

Notably, Co-Conspirator 1 repeatedly brought Mr. Persico up in conversations, trying to implicate him in the extortion scheme. Yet, conversations recorded by Co-Conspirator 1 corroborate that Mr. Persico was only passively involved in the extortion scheme.

For example, the same conversation that the Government relies upon as evidence of Mr. Persico having delegated the extortion scheme to a higher-ranked individual in fact contains evidence that Mr. Persico was **not** supervising anyone in the extortion scheme. Specifically, during an April 13, 2021 conversation between Co-Defendant 1 and Co-Conspirator # 1, Co-Conspirator # 1 attempted to elicit incriminating information on Mr. Persico, asking Co-Defendant 1 about the extortion scheme: "You think Teddy in Staten Island, those guys are all in line with that? No problem?"

In direct response to this questioning about Mr. Persico's involvement ("Teddy in Staten Island"), Co-defendant 1 affirmatively represented that Mr. Persico was **not** issuing any orders in the extortion scheme. "**They don't have nothing to say.** You don't understand." Motion for Bond, ECF # 269, p. 14 (quoting Aril 13, 2021 conversation between Co-Conspirator # 1 and a co-defendant) (emphasis added).

That conversation occurred during a period that the Government referred to as a "critical time" in the Extortion Scheme (March and April of 2021), Arr. Tr. p. 26, 34.

This conversation also occurred months after two purportedly important meetings in November of 2020, demonstrating that months after the November 2020 meetings, Mr. Persico was still only passively involved in the extortion scheme.

On June 21, 2021, during another recorded conversation, Co-Conspirator 1 asked ███

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████
    ████████████████████████████████
    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████
    ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
    ██████████████████████████

Co-Defendant 1's statement, ███████████████████ is a reference to the participants in the conspiracy who actually were exercising decision making authority and supervising the extortion scheme. The participants distinguished the persons who were in control ("Brooklyn") from "Teddy in Staten Island" (Mr. Persico), who was not supervising the extortion scheme or otherwise taking an active role, but had agreed to the conspiracy and agreed not to intervene in the conspiracy were he to rise to power. Further, during this time Co-Conspirator 1 was continuously updated of the many meetings that were being held in Brooklyn, meetings which excluded Mr. Persico.

In another conversation on July 20, 2021, Co-Conspirator 1 asked "what protection do we have *if* the other guy takes over?", referring to if Mr. Persico takes over the enterprise. Detention Memo p. 13 (emphasis added).

Co-Defendant 2[10] responded, "Listen, if he takes, its smooth sailing."

Co-Conspirator 1 then asked if Mr. Persico's promotion to boss was "████████ ████████ Though he added, "███████████████████ meaning until Mr. Persico is no longer on supervised release.

In fact, Mr. Persico avoided taking either supervisory responsibility over any of the participants or an active role in the conspiracies because he was still on supervised release in Bombino, and he did not want Probation catching him in a violation of his supervised release. Thus, according to the PSR, a co-defendant ███████████████████ ███████████████████████████████████████, ███████████████████████████████

---

[10] Co-defendant 2 has already been sentenced to 41 months of imprisonment. As a reminder, Co-Defendant 2, according to the Government "played in integral role in supervising" the extortion scheme. Gov's Sentencing Submission, ECF # 531, p. 3.

████████████████████████████████████████████████████████████████████," PSR

¶ 78.

This reaction to the co-defendant's unsanctioned visit underscores that Mr. Persico was unwilling to supervise others or to take an active role in the extortion of John Doe # 1 or the Labor Union so long as he was on supervised release, if for no other reason than not to get in trouble with Probation. It is for this reason that a recorded conversation on June 9, 2021 discusses how much longer it will be until Mr. Persico is "off paper" (████████████████████ ████████████████████████████████). (Of course, as it turned out, a Violation of Supervised Release proceeding was brought in <u>Bombino</u> when Mr. Persico was arrested in the case at bar. That proceeding is pending before this Court, and we expect the Government to request its dismissal at sentencing.) Certainly, this April 1, 2021 visit to Mr. Persico's place of business would not have been a "major" meeting, notwithstanding the Government utilizing it repeatedly in opposing Mr. Persico's requests for pretrial release.

We do not say this out of any misguided attempt to minimize the seriousness of Mr. Persico's offense, nor to disclaim responsibility for his involvement in the offense. Mr. Persico fully acknowledges that racketeering is a serious offense. Over the course of his incarceration at the Metropolitan Detention Center ("MDC") since his arrest in September of 2021, Mr. Persico has had plenty of time to reflect on his underlying conduct—joining extortion and money laundering conspiracies—and he knows that his involvement in these conspiracies was wrong and requires just punishment.

The reason that we emphasize that Mr. Persico did not give directives to any participants in this offense (at least, no directives apart from "No problem… do whatever youse have to do"), is because, as we will discuss in the next section, the PSR erroneously increases the applicable

aggravating role enhancement based on a mistaken understanding of the extent of Mr. Persico's offense conduct.

**DISCUSSION**

I. The PSR Overstates the Extent of the Applicable Aggravating Role Enhancement.

As per the Plea Agreement, the base offense level for Racketeering Act 1, Extortion Conspiracy, is 18 pursuant to U.S.S.G §§ 2E1.1(a)(2); 2B3.2(a). PSR ¶ 176.

The offense level is increased by a two level enhancement pursuant to USSG §2B3.2(b)(1) as the extortion conspiracy involved the threat of bodily injury to John Doe # 1. PSR ¶ 177.

Another two levels are added pursuant to USSG §§ 2B3.2(b)(2) and 2B3.1(b)(7)(C) because the loss was greater than $ 95,000 but less than $ 500,000. Plea Agreement p. 3. Although John Doe # 1 alleged that his loss was $ 624,000, the Court found that this figure was speculative. Memorandum & Order dated August 30, 2023, ECF # 517. Rather, the known loss, as corroborated by John Doe # 1's bank records, is $ 280,890 ($ 2,600 per month since 2011). Id. This brings the offense level for Racketeering Act 1 to 22.

The Base Offense Level for Racketeering Act 6 (Money Laundering Conspiracy) is 6 pursuant to USSG §§ 2S1.1(a)(1), 2B1.1(a)(2). This is increased by 10 levels pursuant to USSG § 2B1.1(b)(1)(F) (loss greater than $ 150,000, not more than $ 250,000), bringing the offense level for Racketeering Act 6 to 16. PSR ¶ 183.

The highest adjusted offense level is thus from Racketeering Act 1 (Level 22). We agree that the total number of units is 1 1/2, PSR ¶ 189, meaning that one level is added pursuant to USSG § 3D1.4, bringing the Level up to Level 23.

The parties agree that *an* aggravated role enhancement applies in Mr. Persico's case. What the parties disagree with Probation over is the extent of the enhancement and the reason for the enhancement. The PSR alleges that Mr. Persico was a manager or supervisor of a criminal activity involving five or more participants or that was otherwise extensive, and thus the Probation Office recommended a 3 level enhancement pursuant to USSG § 3B1.1(b). Probation is mistaken.

"To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants," USSG § 3B1.1 Application Note 2. That requires the Court to make findings of fact based on the record, and to consider the following factors: "(1) 'the exercise of decision making authority[; (2)] the nature of participation in the commission of the offense[; (3)] the recruitment of accomplices[; (4)] the claimed right to a larger share of the fruits of the crime[; (5)] the degree of participation in planning or organizing the offense[; (6)] the nature and scope of the illegal activity[;] and [(7)] the degree of control and authority exercised over others,'" United States v. Feliz-Ramirez, 2008 U.S. App. LEXIS 23187 (2d Cir. 2008) (quoting USSG cmt. 4).

Although "titles such as 'kingpin' or 'boss' are not controlling," USSG § 3B1.1 Application Note 4, Probation relies upon the contested allegation that Mr. Persico was part of the Colombo racketeering enterprise's "administration," in arguing that Mr. Persico was a supervisor. PSR ¶ 153.

Aside from the fact that Mr. Persico was never part of the administration,[11] aggravating role depends "on the defendant's role **in the offense,**" United States Sentencing Guidelines

---

[11] "Administration" is clearly defined in the Indictment as the boss, underboss, and the consigliere. Indictment ¶ 4. This is how "administration" has always been defined when explaining how such enterprises operate. As any expert on the Colombos and similar enterprises

("USSG") § 3B1.1 (emphasis added). The Introductory Commentary to Part B of Chapter 3 of the USSG provides "[t]he determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of §1B1.3 (Relevant Conduct)."

Here, "the offense," as the Government emphasized in their Opposition to Defendant's Motion to Dismiss, was <u>not</u> general membership in the Colombo racketeering enterprise; it was a pattern of racketeering consisting of an extortion conspiracy and a money laundering conspiracy as set forth in the Indictment. Gov's Opp., ECF # 396, PAGEID # 7432; <u>see also</u> Court's Order, ECF # 438, p. 14 (agreeing with the Government's argument). (We submit that this is consistent with <u>United States v. Ivezaj</u>, 568 F.3d 88 (2d Cir. 2009), from which we learn that if a defendant is entitled to an aggravating role enhancement at all, it adjusts his overall offense level for the RICO conviction, without requiring a court to make separate findings as to the defendant's role for each individual racketeering act. We do <u>not</u> interpret <u>Ivezaj</u> to permit an aggravating role enhancement in a RICO case irrespective of the exercise of any authority over participants in the relevant offense. Such a broad interpretation could theoretically permit a court to sentence a defendant with priors to an aggravating role enhancement based strictly on conduct for which he previously paid his debt to society, rather than based on his conduct as to the matter at hand.)

Probation also argues that Mr. Persico "was present at some major roundtable meetings throughout the course of the instant offense… directed other senior administrators in the Colombo crime family… Effectively, Persico, Jr. had oversight and control over the activities of other criminally culpable participants, some of whom acted on his orders." PSR ¶ 153.

---

will explain, these racketeering organizations have firm hierarchies and traditions. The Government has continued to fail to explain when and how the traditional hierarchical structure was either inverted or restructured.

Probation is wrong about all of the above. We have already addressed, *supra*, that he was not a member of the administration and did not have authority to direct anyone in the administration. We have also thoroughly analyzed the evidence in previous submissions, explaining in detail that the Government has exaggerated the number of meetings that Mr. Persico allegedly attended. For example, the Government erroneously alleged that Mr. Persico attended an important meeting in <u>*Brooklyn*</u> on November 10, 2020, when, in fact, evidence establishes that Mr. Persico was in <u>*Staten Island*</u> when the November 10, 2020 meeting would have taken place. <u>See</u> e.g. Pretrial Motions p. 28 (*inter alia,* citing NYPD License Plate Reader data, E-Z Pass records, and cell phone records, proving that Mr. Persico was in a different borough at the time of the November 10, 2020 meeting); <u>Id.</u> p. 43 – 44, 46 - 47; Pretrial Motions Exhibit C – E-Z Pass records and Cell Phone records, ECF # 382-3; Pretrial Motions Exhibit Z – License Plate Reader Data, ECF # 382-13. <u>See also</u> Motion for Bond ECF # 269 at p. 10 – 12; Motion, ECF # 425, p. 3 - 4. While we now acknowledge that Mr. Persico was given updates from co-conspirators, including speaking with others face to face, this does not mean that any meeting with a co-conspirator was automatically a "major" meeting, nor does it mean that he supervised any co-conspirators.

The Government has already conceded in the Plea Agreement that Mr. Persico was not the leader, manager, or supervisor of one or more participants, but that an aggravating role enhancement (of 2 levels) would still be applied pursuant to USSG § 3B1.1 Application Note 2, which provides in pertinent part "An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." Application Note 2. <u>See</u> Plea Agreement p. 3.

Mr. Persico did not exercise control and authority over the participants in the extortion conspiracy or the money laundering conspiracy. The extortion conspiracy began long before Mr. Persico became aware of it and joined it after his release from prison in the Spring of 2020. In trying to get Mr. Persico released on bond, we specifically stated "that the Government cannot prove that Mr. Persico gave any orders to anyone in the enterprise alleged in the case at bar." Motion ECF # 424, p. 4. The Government filed a single-spaced, 7 page Opposition to said Motion. ECF # 429. Nowhere in that Opposition did the Government proffer a single order that Mr. Persico is alleged to have given to any participants. That omission is certainly not from a lack of discovery, of which the Government had access to plenty, or from a lack of diligence on the Government's part.

As discussed, *supra*, Mr. Persico deliberately avoided accepting supervisory responsibility over any participants or an active role in the conspiracies in an unsuccessful effort to avoid a violation of supervised release proceeding in <u>Bombino</u>. Lower ranked participants in the scheme, such as Co-Defendant 1 were supervised by others, such as Co-Defendant 2, who himself answered to other, higher-ranked co-defendants (the actual administration of the enterprise, as that term is used in the Indictment, which did **not** include Mr. Persico).

Co-Conspirator 1 repeatedly met with active participants in the extortion scheme in Brooklyn, where he was briefed on the status of the extortion scheme and who was involved, since Co-Conspirator 1 was being placed within the Labor Union's Health Fund, and was thus an important part of the scheme. Mr. Persico was not one of the ones briefing Co-Conspirator 1 on the extortion scheme.

Despite Co-Conspirator 1's best efforts to try to record incriminating evidence against Mr. Persico between April 2021 and September of 2021, the conversations that were recorded by

Co-Conspirator 1 indicate that those in control of the extortion scheme ("in Brooklyn") were distinguished from Mr. Persico ("Teddy in Staten Island"), who did not yet have any authority over any of the participants because he was "on paper" (supervised release), and had not risen to the position of boss, nor to the enterprise's administration. Thus, for example, during the April 13, 2021 conversation, ████████████████████████████████████████

███████████████████████████████████████████████████████████████

████.[12]

Mr. Persico's role in the extortion scheme remained passive. Others were specifically chastised for going to Mr. Persico in Staten Island, who was still "on paper", instead of going through the proper administrative channels in Brooklyn. He was informed of the decisions that others made and the actions taken by other participants, and had assured that he would remain on board with the extortion scheme and would not implement changes should he become promoted to the administration. See, e..g. June 21, 2021 conversation: ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ See also July 20, 2021

conversation ████████████████████████████████████████████████████

██████████████████████████████████████████████

Co-Defendant 2, who actually was a supervisor in the extortion scheme and has already been sentenced for his role, explained Mr. Persico's assurance that the participants could continue the ongoing extortion scheme: "'No problem, he says do whatever youse have to do. He don't care about nothing, he just wants to go out… have a good time, the guy spent 30 fucking

---

[12] We attach this excerpt as an exhibit. If necessary, we can provide recordings and transcripts to the Court.

years in jail already… he's just about, you know what, do the right thing with me, ah, and I'm good with it, you know, he's not selfish,'" Gov's Opp. to Motion for Bond, ECF # 429, p. 6 (quoting co-defendant discussing Mr. Persico).

This laid back approach that the declarant describes ("do whatever… He don't care"), <u>Id.,</u> indicates Mr. Persico passively exercised management responsibility over the property, assets, or activities of the enterprise.

We agree with the Government that this exercise of authority over the activities of the enterprise should result in <u>a 2 level</u> enhancement pursuant to Application Note 2 to § 3B1.1. But it does <u>not</u> constitute exercising authority or control over any of the *participants* in the extortion and money laundering schemes, and it does not qualify him for a 3 level enhancement as a manager or supervisor of another person. <u>See United States v. Mangano</u>, 2022 U.S. Dist. LEXIS 66913, *25, 2022 WL 1085300 (EDNY April 11, 2022) (enhancement does not apply where defendant "did not manage or supervise" others "in any conventional sense"); <u>United States v. Sampel</u>, 860 Fed. Appx. 789, 792 (2d Cir. 2021) (remanded where aggravating role enhancement was unsupported by factual findings); <u>United States v. Gotti</u>, 459 F.3d 296, 349 – 350 (2d Cir. 2006) (upholding denial of aggravating role enhancement).

Wherefore, in accordance with the Plea Agreement, the aggravated role enhancement adds 2 levels, not 3.

The two level aggravated role enhancement would raise the overall offense level to 25. However, the enhancement is effectively cancelled out by the two level reduction pursuant to USSG § 5K2.0 for Mr. Persico's participation in a Global Resolution. Plea Agreement, p. 3; PSR ¶ 272.

The resulting offense level after the enhancement and the reduction is 23. Plea Agreement p. 3.

Because Mr. Persico timely accepted responsibility by pleading guilty before July 14, 2023, a three level reduction is warranted pursuant to USSG § 3E1.1, which brings the final adjusted offense level down to **<u>Level 20</u>**, as per the Plea Agreement ¶ 2, page 3 (<u>not</u>, as the PSR erroneously states at ¶ 272, Level 21).

Criminal History can be addressed at Mr. Persico's sentencing. For now, we note that the stipulation in the Plea Agreement assumes that Mr. Persico is in Criminal History Category V. Plea Agreement ¶ 2. However, according to the Probation Office, Mr. Persico is in Criminal History Category IV. PSR ¶ 210.

If Probation is correct in the calculation of Mr. Persico's Criminal History Category, then at Category IV, Offense Level 20, Mr. Persico's advisory Guideline range would be 51 to 63 months. If the Plea Agreement's estimate of Category V is correct, then the advisory range would be 63 – 78 months.

Either way, as we will discuss in the next section, a below-guidelines sentence is appropriate under 18 USC § 3553(a).

<u>II. A Non-Guidelines Sentence Is Sufficient But Not Greater Than Necessary.</u>

Having discussed the nature and circumstances of the offense, we turn now to the history and characteristics of the defendant. Mr. Persico was born in Brooklyn in 1963.[13] He has three half-brothers, as well as a brother who passed away from ███████████ in 2018. PSR ¶ 216.

---

[13] PSR ¶ 215.

From 1978 to 1979, Mr. Persico worked as a carpet layer. PSR ¶ 250. From 1981 to 1986, Mr. Persico worked as a truck driver. PSR ¶¶ 247 – 248. In 1986, he opened his own business in Staten Island: an autobody shop called Vintage Collision. ¶¶ 246 – 247.

In 1987, Mr. Persico owned a coffee machine service company called Perks Coffee. PSR ¶ 245.

After attending New Utrecht High School, until the 11th grade,[14] in 1988, Mr. Persico obtained his GED while imprisoned at Coxsackie Correctional Facility for selling cocaine to an undercover police officer on three occasions in June of 1986. PSR ¶¶ 231, 203 - 204.

From 1992 – 1993, Mr. Persico attended a few semesters of college during the same term of imprisonment (originally 25 years on one count and life imprisonment on the remaining counts, until his sentence was reduced to 5 to 15 years).[15] Specifically, Mr. Persico was studying business at Sullivan County Community College via a correspondence program until he was transferred from Sullivan County Correctional Facility to Attica Correctional Facility. PSR ¶230.

Mr. Persico also utilized his time in prison to train in air conditioning and HVAC repair and maintenance. PSR ¶ 232.

Upon his release from prison in 2004, he worked for a few months as a yard worker and heavy equipment operator for Big R Trucking, before starting another business—T&E Trucking. PSR ¶¶ 242 – 243.

Following a term of imprisonment for racketeering, Mr. Persico worked full-time as a dispatcher for Vintage Towing from 2008 to 2009.[16] From 2009 until his arrest in 2010 in

---

[14] PSR ¶ 235.
[15] PSR ¶¶ 230, 203 - 204.
[16] PSR ¶ 240.

Bombino, Mr. Persico worked as the manager of Vintage Collision (under the ownership of his cousin). PSR ¶ 239.

From his release in 2020 until his arrest in the case at bar in September of 2021, Mr. Persico resumed his role as manager of Vintage Collision (which was then and still is owned by his fiancée). PSR ¶ 237. As manager of Vintage Collision, his duties included, but were not limited to, co-managing approximately eight or nine employees, operating a tow truck to retrieve damaged cars, and painting cars. Id.

The significant other of his late brother describes Mr. Persico's work ethic. "The one attribute that stands out to me about Teddy is that he truly loves to work, particularly with his hands. He is happiest when his head is under the hood of a car. He likes to get up early and put in a full day of work. I remember during Covid I had a conversation with him about people enjoying not having to go to work. He immediately responded, 'not me' and he meant it. He is a humble hard worker." Letter from Susan Giordano (attached). His work ethic is also confirmed by his former employer at Big R Trucking. PSR ¶ 243.

Mr. Persico's history of maintaining legitimate employment when in society is a factor that the Court should take into consideration under § 3553(a). See United States v. Jones, 460 F.3d 191, 194 (2d Cir. 2006) (affirming non-Guidelines sentence and rejecting Government's argument that Court improperly considered factors, such as employment history, that ordinarily do not support *departures*, which are distinct from *variances*). "With the entire Guidelines scheme rendered advisory by the Supreme Court's decision in *Booker*, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated guidelines ranges themselves." Id. See also United States v. Gayle, 2011 U.S. Dist. LEXIS 12308, *11 (S.D.N.Y. February 8, 2011) (long history of legitimate employment one of

the reasons Court ordered a below-Guidelines sentence); <u>United States v. Suka</u>, 19 CR 442 (BMC) (E.D.N.Y. March 23, 2021) (sentencing defendant, who was gainfully employed while out on bond, to a non-Guidelines sentence of three years of Probation, with a special condition of six months in a residential reentry center, due to Court's concern that a term of imprisonment would do "more harm than good" by causing the defendant to lose his job).

Thus, the defendant's work history is one factor that would support a below-Guidelines sentence. We turn now from the defendant's employment history to his commitment to his family.

### A. Devotion to Fiancée and Other Loved Ones.

Mr. Persico and his fiancée, Nicole Russo, have been in a relationship since 2008.[17] In between his release from his term of imprisonment in <u>Bombino</u> and his arrest in the case at bar, Mr. Persico and Ms. Russo were living together.

During that time, Mr. Persico demonstrated his devotion to Ms. Russo and to both of their mothers. Mr. Persico's mother, a divorcee, is now in her 80s and suffering from ███████ ████████████████,[18] but avoids going to doctors.[19] With Mr. Persico's brother's passing, the defendant is her only living child.[20] Before his arrest in the case at bar, Mr. Persico was taking care of his mother. For example, Mr. Persico cleaned his mother's home, "power washed its outside, he removed mold from the exterior sides of the home, and he redid her floors. He also routinely ordered food to be delivered to her home." PSR ¶ 219.

---

[17] PSR ¶ 220.
[18] Motion for Bond, ECF # 424, 425, p. 6.
[19] PSR ¶ 215.
[20] Mr. Persico's half-siblings are on his father's side of the family.

Ms. Russo has been ███████████████████████.[21] In 2021, she was diagnosed ███████████[22] She has also been diagnosed █████████████████.[23] According to Ms. Russo, ███████████████, Mr. Persico ███████████████████████████████ ███████████████████████████████████████████████ ████████████████████████" Letter from Nicole Russo dated March 5, 2022 (filed under seal as Ex. E to ECF # 424).

Ms. Russo explains how she depended on Mr. Persico in her life. "I am finding it challenging to withstand ████████████, my mother who is also sick, his mother, run a business and keep up the commitment I made for my rescue animals. I desperately need Theodore's help and support." <u>Id.</u> "███████████████████████████████ ██ ██████████████████████████ Without Theodore, I would not have made it through those dark times. I wanted to give up and stop fighting so many times, there are times I still want to give up, but he keeps me going. He has been there for me, taken care of me, helped me grow, encouraged me… showed me unconditional love when I didn't love myself and he never once gave up on me… He loves hard, works hard and sacrifices for everyone else, and I need him. The past 25 months have been unbearable without him home." Letter from Nicole Russo dated October 10, 2023 (attached).

Although, in our experience, the Government generally argues against taking family responsibilities into consideration, Mr. Persico's fiancée's and mother's reliance on him weigh in favor of a below-Guidelines sentence. <u>See</u>, e.g. <u>United States v. Barnett,</u> 727 Fed. Appx. 712,

---

[21] PSR ¶ 220.
[22] Letter from Nicole Russo dated March 5, 2022, filed under seal as Exhibit E to Motion for Bond, ECF # 424.
[23] Letter from Renee LaRock-Gary, LMHC, filed under seal as Exhibit F to Motion for Bond, ECF # 424.

714 (2d Cir. 2018); <u>United States v. Gonzalez,</u> 566 Fed. Appx. 44, 48 (2d Cir. 2014); <u>Gordon v. United States</u>, 2011 U.S. Dist. LEXIS 72592, Footnote 1 (S.D.N.Y. 2011); <u>Burgos v. United States</u>, 2010 U.S. Dist. LEXIS 110314, *6 (S.D.N.Y. 2010); <u>United States v. Weisberg</u>, 2010 U.S. Dist. LEXIS 106722, *30 - 31 (W.D.N.Y. 2010); <u>United States v. R.V.</u>, 157 F. Supp. 3d 207, 267 (E.D.N.Y. 2016); <u>United States v. G.L.</u>, 305 F.R.D. 47, 52 (E.D.N.Y. 2015).

In fact, the Second Circuit has, in the past, criticized the Government for falsely equating variances with the rules governing downward departures for family ties and responsibilities. <u>United States v. Jones</u>, 460 F.3d 191, 194-195 (2d Cir. 2006). <u>Cf.</u> <u>United States v. Handy</u>, 752 F. Supp. 561, 564 (E.D.N.Y. 1990) ("'[I]t was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising discretion, flexibility and independent judgment,'") (quoting <u>United States v. Lara</u>, 905 F.2d 599, 604 [2d Cir. 1990]); <u>United States v. Shabazz</u>, 1993 U.S. Dist. LEXIS 21079 at *2 (S.D.N.Y. October 1993) (quoting same).

Wherefore, since we are asking for a downward *variance*, not a downward departure, Mr. Persico's responsibilities to his family weigh in favor of a below-Guidelines sentence.

We turn now to the harshness of the conditions at the MDC, and to the MDC's failure to provide necessary medical evaluations.


<u>B. Conditions at the MDC.</u>

Mr. Persico has been detained at the Metropolitan Detention Center in Brooklyn ("MDC") since his arrest in the case at bar on September 14, 2021, while the COVID-19 pandemic was still ongoing. Conditions at the MDC were poor to begin with—after all, the

institution has been "described by a judge as an 'ongoing disgrace.'"[24] However, the MDC became even more deplorable and egregious during the pandemic.

Between the onslaught of the COVID-19 pandemic and the closure of the Metropolitan Correctional Center, the MDC has been understaffed. Noah Goldberg, *Brooklyn federal jailers work 16-hour shifts amid prisoner influx as government shuts Jeffrey Epstein suicide lockup in Manhattan*, New York Daily News (September 3, 2021), Available at: https://www.nydailynews.com/new-york/ny-nyc-elected-officials-mdc-mcc-transfers-closing-jeffrey-epstein-20210903-sy4slespabfyjjn6cnnhb3ralm-story.html (visited on August 1, 2023); Noah Goldberg and John Annese, *More problems at fed jail in Brooklyn; Inmates report no lights, water or hot food, few staffers,* New York Daily News (October 10, 2021), Available at: https://www.nydailynews.com/new-york/nyc-crime/ny-water-electricity-conditions-mdc-brooklyn-20211010-27q6mnw6jre4llsko6jbww4m74-story.html (visited on August 2, 2023).

Before the pandemic, prisoners at the MDC would have been permitted one social visit every week[25] and inmates in the general population would normally have been permitted out of their cells every day from 6 a.m. to 9:30 p.m. Id. p. 2 – Male Inmate Management. Excluding the daily afternoon count, let's say that pre-pandemic, non-SHU inmates would have been outside of their cells for approximately 13 hours on a typical day.

---

[24] Noah Goldberg and John Annese, *More problems at fed jail in Brooklyn; Inmates report no lights, water or hot food, few staffers,* New York Daily News (October 10, 2021), Available at: https://www.nydailynews.com/new-york/nyc-crime/ny-water-electricity-conditions-mdc-brooklyn-20211010-27q6mnw6jre4llsko6jbww4m74-story.html (visited on August 2, 2023).
[25] Office of the Inspector General, *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, p. 4 – Legal and Social Visiting for Male Inmates (September 2019), Available at: https://oig.justice.gov/reports/2019/e1904.pdf (visited on August 2, 2023).

Even in 2023, the MDC has not returned to pre-pandemic visiting rules. Instead, the MDC has been permitting each inmate no more than <u>one</u> social visit approximately every <u>three</u> weeks (with no ability to reschedule any missed visits, meaning that if a scheduled social visit is unable to take place for any reason, the inmate must wait until another three weeks have elapsed in order to see his family).

During the COVID-19 era, Mr. Persico and other MDC inmates were frequently under pandemic-related lockdown "for nearly 24 hours per day for weeks on end, without anything to do, generally having only 15 minutes outside of their cells to use the phone or shower," and with "limited access to medical care," [26] with social visiting and religious services suspended (and, at times, with in person legal visits also suspended).

Even in 2023, it is typical for the MDC to be on lockdown for days at a time, with inmates more often than not on lockdown on weekends with no access to phones, and no access to *medical treatment,* let alone access to computers. One client who kept track found that in July <u>2023</u>, there was <u>not one single day</u> in which inmates in his housing unit[27] were allowed outside of their cells for 13 hours, with the average number of hours an inmate was permitted outside of the cell in July 2023 being approximately 5.2 hours.

Regardless of whether the current conditions are due to staffing shortages (as we believe) or because of the MDC simply deciding not to return to pre-pandemic practices, the result is that conditions at the MDC remain significantly harsher than they were before the Coronavirus pandemic.

---

[26] Sentencing Submission in <u>United States v. Miljanic</u>, 21 CR 191 (LDH) (E.D.N.Y.) Doc # 37, p. 11.
[27] We recognize that there could be some variation from one housing unit to another, but we assume that (excluding the SHU), conditions of confinement would be relatively uniform across the MDC.

We documented in a previous filing that Mr. Persico has had trouble getting necessary medical evaluation while at the MDC. Mr. Persico's brother, whom he described as his "best friend," passed away from ███████,[28] and Mr. Persico's aunt passed away in December of 2022 from ████████████████████. On September 23, 2021, we emailed the MDC's Legal Department a letter from Mr. Persico's primary care physician, explaining that Mr. Persico has a family history of ████████, that it was therefore "█████████████████████ ██████████████████████████" ████████████████████████████████. Letter from Primary Care Physician, filed under seal as Exhibit D to Defendant's February 21, 2023 Motion for Bond ECF # 424; Ex. C to Motion – 9/23/21 Email to MDC Legal, ECF # 425-3; PSR ¶ 226.

Yet, in spite of being notified in September of 2021 of the need for these medical evaluations, the MDC ignored the request ████████████████████ According to the PSR, neither procedure ever occurred. PSR ¶ 227. See also 2/21/23 Motion for Bond, p. 7. See also Mr. Persico's Trulincs message to Sick Call dated 4/24/23 and 6/9/23 (attached).

Long before 2020, the Second Circuit recognized that harsher conditions of confinement can constitute grounds for a lower sentence. United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures").[29] See also United States v. Rodriguez, 651 Fed. Appx. 44, 48 - 49 (2d Cir. 2016) (noting that defendant had received a downward variance, in part due to the "excessively harsh conditions of his confinement at… a Super Max prison").

---

[28] PSR ¶ 216.

[29] Of course, we are asking for a downward *variance*, not a downward departure, but the Court has greater latitude with respect to variances.

More recently, pre-sentencing conditions of confinement (including but not limited to at the MDC), have factored into the imposition of below Guidelines sentences. <u>United States v. Marmolejo</u>, 20 CR 1 (JSR) (S.D.N.Y.) Doc. # 35 – Transcript of February 3, 2021 Sentencing, p. 14, L. 7 – 17 ("THE COURT: …Argument number one, which I wholly agree with, is that this defendant… has had a harsher experience during his 13 and a half months in jail than would have been the case prior to the pandemic. And the argument therefore is he's been punished more that the time period would otherwise suggest, and he ought to be given in effect credit because he's endured those harsher conditions. I agree with that totally"); <u>United States v. Searles,</u> 19 CR 381 (GBD) (S.D.N.Y.) Doc. # 61 – Transcript of March 24, 2021 Sentencing, p. 33 – 34; <u>United States v. Soto</u>, 19 CR 903 (KMW) (S.D.N.Y.) Doc. # 54 – Transcript of March 19, 2021 Sentencing, p. 20; <u>United States v. Almonte</u>, 19 CR 621 (RA) (S.D.N.Y.) [30] Doc. # 85 – Transcript of January 14, 2021 Sentencing, p. 21 - 22. <u>See also United States v. McRae</u>, 2021 U.S. Dist. LEXIS 8777, *10 – 11, 2021 WL 142277 (S.D.N.Y. January 15, 2021) (collecting cases); <u>Zelaya-Romero v. United States</u>, 2023 U.S. Dist. LEXIS 68554, *3 - 4, 2023 WL 3001871 (S.D.N.Y. April 19, 2023) (conditions at the MDC, including the pandemic as well as the pre-pandemic blackout, had been a factor in granting a downward variance). <u>Cf.</u> <u>U.S. v. Zhu</u>, 18 CR 423 (BMC) (E.D.N.Y. February 2022) (the deciding factor in sentencing defendant to a non-incarceratory, non-Guidelines sentence of time-served was court's assessment that defendant did not deserve to face the conditions at the MDC, where, in all probability, he would have been designated to serve any term of imprisonment); <u>U.S. v. Pizzonia</u>, 20 CR 645 (PAE) (S.D.N.Y. May 2022) Doc. # 165 – Judgment in a Criminal Case, p. 2 (strongly recommending "that the

---

[30] These and additional cases on point are collected at <u>United States v. Miljanic</u>, 21 CR 191 (LDH) (E.D.N.Y.) Doc. # 37, p. 12.

defendant NOT be designated to the Metropolitan Detention Center" despite it having been highly unusual, if not unheard of at the time, for a defendant in the district to be designated elsewhere for a sentence of only two months) (emphasis in original).[31]

During his detention for the case at bar, Mr. Persico, like the defendants in <u>Searles</u>, <u>Soto</u>, <u>Almonte</u>, <u>Marmolejo</u> and so on, has faced conditions of confinement that are much harsher than the United States Sentencing Commission could possibly have contemplated when formulating the United States Sentencing Guidelines. For example, Mr. Persico was quarantined for over a month, beginning on the date of his arrest on September 14, 2021, during which time he was unable to have any in-person legal visits. Letter Motion for Judicial Intervention dated October 15, 2021, ECF # 108. As we explained in the Letter to Judge Ross, in addition to quarantining all new inmates for 14 days at a time, the Bureau of Prisons "quarantined" any inmate that tested positive for COVID-19 in the same housing unit with other such inmates for 14 days at a time, and would restart the 14 day quarantine clock for *all* the inmates in the quarantined unit if even one of the inmates in the quarantine unit re-tested positive.[32]

Wherefore, the harshness of the conditions at the MDC, as well as the need for Mr. Persico to receive proper medical attention that he has not been receiving from the BOP, weigh in favor of a below-Guidelines sentence.

---

[31] We were pleasantly surprised by the fact that the BOP actually followed Judge Engelmayer's recommendation, though perhaps not as surprised as the designated BOP facility was to receive an inmate sentenced to only two months of imprisonment.

[32] Letter Motion Doc # 108, p. 4 – 5 (requesting judicial intervention in light of prolonged inability to have any in person legal visits with  client  quarantined at MDC for over a month) (citing <u>United States v. Scparta,</u> 2020 U.S. Dist. LEXIS 68935 [S.D.N.Y. April 2020]).

<u>C. Giving Back to the Community</u>.

In addition to his devotion to his family, Mr. Persico has also given back to the community. For example, Scott Palma, President of the Kiwanis Club, writes of the defendant's participation "in Kiwanis Club fundraising events. The first instance that came to mind was his help in coordinating the activities for our Leukemia & Lymphoma Society fundraiser where he provided games, prizes and gift baskets. His next contribution was to our annual Children's Christmas party. Not only has he donated the Christmas tree, but Theodore also went above and beyond to ensure that there was no shortage of gifts for the children." Letter from Scott Palma (attached).

Another letter tells of how Mr. Persico volunteered at a lunch for a youth league in Staten Island. "Teddy… was one of a few people who helped prepare the food for the kids making the event a success. There is no way that he had to help out he didn't get paid to be there or any perks besides being a decent person who just wanted to help out and make the event a good experience for the kids and their families." Letter from Michael Giovanelli (attached).

His fiancée recounts how she and Mr. Persico have worked together to help the community, including at "events the Diller-Von Furstenberg Family Foundation has held. This foundation assists organizations such as afterschool programs… The awards event… honors 5 women with a grant to further their work in human rights, healthcare, and environmentalism. Theodore and I have provided transportation to the event, photo booths and gift bags, as well as a helping hand to set up. Another rewarding contribution comes in the form of helping animals. From rescuing, fostering, volunteering, and fundraising for animal shelters/rescues, Theodore and I have done it all. Believe it or not, he enjoys doing this. In 2020 Theodore built outdoor houses for my work with Brooklyn Animal Action… In 2021 we borrowed a sprinter van to

transport 21 dogs that were rescued from a backyard breeder. We have helped the New York Bully Crew with transporting dogs from precincts to foster homes and helped with fundraising events. Our future plans are to build an animal sanctuary in NJ so we can continue our efforts to rescue the ones that are overlooked." Letter from Nicole Russo, dated 10/10/23 (attached).

Michael Giovanelli also recalls an incident where Mr. Persico stopped to help a stranger with car trouble. "Teddy who had been walking by… stopped and offered a hand… he was able to fix the car and get it running again. After the run-in with Teddy, my co-worker called me to tell me how great of a guy Teddy was and how he couldn't believe a stranger just stopped to help him on the street… There are more stories that I could tell about him that explains his potential and drive to do more good than bad if given the chance to be released early." Letter from Michael Giovanelli (attached).

Mr. Persico's former pastor, Monsignor David L. Cassato, adds that "Teddy had helped out and Volunteered throughout our neighborhood, he is a person that would give a shirt off his back to help others… It is at the very core of his being." Letter from Monsignor David L. Cassato (attached).

We turn now to the need to avoid unwarranted disparities.

<u>D. The Need to Avoid Unwarranted Disparities With Similarly Situated Defendants.</u>

Of the six co-defendants who have been sentenced to date, five of them received non-guidelines sentences (including three non-incarceratory sentences). A co-defendant who was actively involved in the extortion conspiracy received 28 months of imprisonment, despite his guidelines being 37 – 46 months. Another co-defendant who was involved in the extortion conspiracy received a guidelines sentence of 41 months.

We are not asking for a sentence of 41 months (let alone 28 months). As a result of his Criminal History (whether in Category IV as calculated by Probation or Category V as estimated in the Plea Agreement), Mr. Persico's guidelines range is higher than these co-defendants. However, as discussed *supra*, in spite of Mr. Persico's aggravated role, the reality is that he was much more passively involved in the extortion conspiracy than these co-defendants.

We submit then that the need to avoid unwarranted disparities weighs in favor of a below-Guidelines sentence.

E.   The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Given the harshness of the conditions at the MDC that Mr. Persico has faced since his arrest in September of 2021, discussed *supra,* we respectfully submit that a Guidelines sentence would be greater than necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for Mr. Persico's offense.

Research indicates that strict adherence to the United States Sentencing Guidelines does not promote respect for the law. The average member of society, if given a choice, would not hand down a sentence anywhere near as long as a Guidelines sentence. Hopwood, Shon R., Improving Federal Sentencing (March 15, 2018). University of Missouri-Kansas City Law Review, Vol. 87, No. 79, at Footnote 48 and p. 90, 2018. Available at SSRN: https://ssrn.com/abstract=3353521 (quoting James S. Gwin, Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?, 4 Harv. L. & Pol'y Rev. 173, 187-88 [2010]) (study showed that Guidelines sentences could, at times, be over ten times greater than what jurors would recommend).

Even federal judges have agreed that the United States Sentencing Guidelines can be draconian. "While in the pre-guideline era, judges sometimes imposed excessively harsh sentences, under the guidelines, harshness became a rule of law." Hon. Lynn Adelman, How Congress, the U.S. Sentencing Commission and Federal Judges Contribute to Mass Incarceration at 6 (December 7, 2016). Available at: SSRN: https://ssrn.com/abstract=3070489 or http://dx.doi.org/10.2139/ssrn.3070489. See also Hon. Jed S. Rakoff, Why The Innocent Plead Guilty and the Guilty Go Free: And Other Paradoxes Of Our Broken Legal System, p. 15 (2021) (hereafter "Why The Innocent Plead Guilty") ("draconian guidelines").

Given then that Guidelines sentences generally do not promote respect for the law, and given that the U.S. Sentencing Commission did not take into account conditions at the MDC when formulating the Guidelines, we respectfully submit that a below-Guidelines sentence is appropriate.


F. The Need to Protect the Public from Further Crimes of the Defendant.

We can understand if the Government and the Court are skeptical, given the defendant's criminal record, but Mr. Persico does want to turn over a new leaf. Since his arrest in the case at bar, Mr. Persico has been taking classes at the MDC, including but not limited to Basic Bookkeeping, Business Acumen, Conflict Resolution, and Marketing Basics. See Certificates of Completion and Inmate Education Data Transcript (attached).

The partner of his late brother explains that Mr. Persico "has a lot of sadness that he couldn't help his dying brother and father since he was incarcerated at that time. He doesn't want that to ever happen again with any other loved ones. He just wants to work and take care of his family. He is rehabilitated." Letter from Susan Giordano (attached).

Monsignor David L. Cassato, who has known Mr. Persico for more than 25 years, asks the Court to show compassion when sentencing Mr. Persico, stating that "I truly believe… that he has it within him to acknowledge and seek redemption." Letter from Msgr. David L. Cassato (attached).

Mr. Persico has had time over the past two-plus years at the MDC to reflect on the nature of his actions and to realize that taking even a passive role in conspiracies is wrong and will land him in prison again. He understands now that if he wants to be able to be home with his fiancée and rejoin society, he has to fully sever his ties to organized crime, and not just try to keep up appearances.

Thus, we respectfully submit that a below Guidelines sentence would be sufficient but not greater than necessary to protect the public from further crimes of the defendant.

## CONCLUSION

Wherefore, we respectfully request that the Court impose a below-Guidelines sentence on Mr. Persico.

Dated: New York, New York
      November 24, 2023

Respectfully submitted,

*/s/ Joseph R. Corozzo*

Joseph R. Corozzo
Angela D. Lipsman
Rubinstein & Corozzo, LLP
*Attorneys for Defendant*
*Theodore Persico*
260 Madison Avenue, 22d Fl.
New York, New York 10016
(212) 545-8777 (ph)
(917) 722-8206 (fax)
jcorozzo@rubcorlaw.com

alipsman@rubcorlaw.com


cc:     Probation Officer Frank Nikolaidis (via email)
        Assistant United States Attorneys Devon Lash,
            Andrew Reich, Michael Gibaldi (via email)