

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:DEL/MWG/ADR  *271 Cadman Plaza East*
F. #2020R00637  *Brooklyn, New York 11201*

December 8, 2023

By ECF

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Theodore Persico
                  Criminal Docket No. 21-466 (S-1) (HG)

Dear Judge Gonzalez:

      The government respectfully submits this letter in advance of sentencing of defendant Theodore Persico, Jr., currently scheduled for December 15, 2023. On July 12, 2023, Persico pleaded guilty to racketeering, in violation of Title 18, United States Code, Section 1962(c), in connection with an extortion and money laundering conspiracy he committed as a captain of the Colombo organized crime family of La Cosa Nostra. In light of the factors set forth in 18 U.S.C. § 3553(a), the government requests that the Court impose a sentence at the high end of the United States Sentencing Guidelines (the "Guidelines") range of 57 to 71 months' imprisonment, followed by a term of 3 years' supervised release and $280,890 in restitution to John Doe #1.

I.     Background

      Theodore Persico, Jr. has dedicated his life to crime. He has two prior federal convictions for crimes committed as a part of the Colombo crime family. His commitment to the Colombo crime family and its goals is so strong that, as the evidence in this case demonstrated, Persico, then a captain, was selected as the family's next leader. Indeed, during this time, Persico and members of the crime family sought to infiltrate and siphon funds from a Queens-based labor union (the "Labor Union") and its associated health fund (the "Health Fund") and continue its long-running extortion against its senior officials, including John Doe #1.

      As explained below, despite his court-ordered supervision, Persico repeatedly met with other members to discuss the ongoing scheme, supported its two most active participants, and ensured that the Colombo crime family's underboss (the family's second most powerful member), would directly supervise it. Persico expected the crime family's stranglehold on the Union to net

hundreds of thousands of dollars — money that would go directly into Persico's pocket as a high-ranking member of the crime family and its heir apparent.

    A.    <u>Persico's Criminal History</u>

To understand Persico's role in this case and within the Colombo crime family, it is first necessary to discuss his lengthy criminal history, his increasing influence, and his promised elevation to its leadership.

Persico's verified criminal history begins at age 17 for a 1981 conviction for attempted grand larceny in Richmond County Criminal Court. Presentence Investigation Report dated October 17, 2023 ("PSR") ¶ 199. In 1982, he was convicted for receiving stolen property in Hunterdon County District Court in New Jersey. <u>Id.</u> ¶ 200. In 1983, he was convicted for attempted grand larceny in Kings County Supreme Court, <u>id.</u> ¶ 201, and for disorderly conduct in Nassau County Court, <u>id.</u> ¶ 202. In 1987, Persico was convicted by a jury for criminal sale of controlled substances. <u>Id.</u> ¶ 203. He initially sentenced to 20 years to life but was later resentenced to five to 15 years. <u>Id.</u> He was released to parole on April 28, 2004. <u>Id.</u> During his incarceration, he sustained 13 disciplinary sanctions for violations. <u>Id.</u> ¶ 204.

Within weeks of his release from prison in 2004, Persico met with other members of the Colombo crime family. In May 2004, Persico obtained a gun in advance of a meeting with a Colombo soldier, which he discussed having to wipe clean of fingerprints. <u>See</u> Case No. 05-CR-351, ECF Dkt, No. 86 at 4. In November 2004, he sought to collect an extortionate debt from an individual (the "Victim"). To force the Victim to pay, Persico threatened to give Victim's son a "f---in' beatin," and stated that he would "take it out on [Victim's] kids, that's all, until he f---in' does the right thing." <u>Id.</u> at 2. Persico personally visited Victim's business twice. In 2005, Persico was arrested and detained pending trial. Later that year, he pleaded guilty to racketeering in connection with his membership in and association with Colombo crime family between April 2004 and April 2005, for acts extortionate collection of credit and attempted extortion. He was sentenced to 42 months' imprisonment and three years' supervised release. PSR ¶ 205.

Persico was released from prison and commenced his next term of supervision on June 4, 2008. Less than two years later, on March 9, 2010, Persico was arrested for racketeering conspiracy and wire fraud conspiracy while on supervised release. <u>See</u> Case No. 10-CR-147. He was detained pending trial. During his pretrial detention, on April 26, 2011, the Probation Department issued a Violation report charging that between June 4, 2008 (the date of his release) and March 9, 2010, Persico engaged in a racketeering conspiracy, a wire fraud conspiracy, extortion and extortion conspiracy, all while acting in his capacity as a captain in the Colombo family.

On June 8, 2012, Persico waived indictment and pleaded guilty to conspiracy to commit the October 1993 murder-in-aid-of-racketeering of Joseph Scopo. <u>See</u> Case No. 10-CR-147, ECF Dkt. No. 561-63. The government's sentencing letter and the Presentence Investigation Report noted that in August 1993, Persico was briefly furloughed from state prison to attend his grandmother's wake. <u>See</u> Case No. 10-CR-147, ECF Dkt. No 739, at 3; PSR ¶ 207. During that furlough, he ordered members of his crew to kill Scopo, a member of a rival faction of the Colombo crime family. <u>Id.</u> ¶ 207. Scopo was shot and killed in front of his home in Queens as he was

returning from dinner with his nephew and future son-in-law. Id. Persico was ultimately sentenced to 120 months' imprisonment on the murder conspiracy charge, a consecutive sentence of 24 months' imprisonment on the violations of supervised release, and a term of three years' supervised release.[1] He was released to the current term of supervision in May 2020. Id.

  B.  <u>Persico's Promotion to Lead the Colombo Crime Family</u>

Not only did Persico resume his criminal association with members of the Colombo crime family following his release from federal prison in May 2020 but the government's investigation has shown that Persico was selected to lead the Colombo crime family.

Persico, along with the Colombo crime family's late boss Andrew Russo, underboss Benjamin Castellazzo, consigliere Ralph DiMatteo, captain Richard Ferrara, captain Vincent Ricciardo, attended a meeting with the crime family's leadership on November 19, 2020 at a Brooklyn restaurant. Vincent Ricciardo told a co-conspirator who later pleaded guilty to a cooperation agreement with the government (Co-Conspirator #1) that at the meeting, the Colombo family addressed its hierarchy and determined that Persico would follow Russo as the crime family's boss. At this meeting, the high-ranking members of the crime family also discussed the scheme to infiltrate and siphon thousands of dollars each month from the Labor Union. Shortly thereafter, Co-Conspirator #1 was hired as a consultant at the Labor Union to launder proceedings from the Union members to the Colombo crime family.

Persico's impending promotion was further confirmed by members' statements in intercepted calls and consensual recordings throughout the investigation. For example, on June 21, 2021, in a consensual conversation with Co-Conspirator #1, Vincent Ricciardo confirmed that Persico was the family's "new regime." In another example, on July 20, 2021, when Uvino explained that it would be "smooth sailing," "when [Persico] takes" over the Colombo crime family. PSR ¶ 99. Persico's anticipated promotion was also reflected by the influence Persico exerted over other members of organized crime, as discussed below.

  C.  <u>Persico's Involvement in the Extortion-Money Laundering Scheme</u>

The PSR details the breadth and nature of the Colombo crime family's extortion scheme against the Labor Union's senior official, who is referred to in the Superseding Indictment as John Doe #1. The extortion began in 2001 and principally entailed defendant and Colombo crime family captain Vincent Ricciardo collecting $2,600 monthly from John Doe #1's salary, which Ricciardo sometimes referred to as a "pension" for himself from the Labor Union. PSR ¶¶ 33-34. In 2020, members and associates of the Colombo crime family approached John Doe #1 in a grocery store, appeared at his home while his family was present, visited his Labor Union workplace, forced him to attend meetings with members of the crime family, and repeatedly and frequently called and texted him in connection with the extortion. PSR ¶¶ 33-45, 47-48. Between 2001 and 2020, John Doe #1 paid more than $600,000 to the members of the Colombo crime

---

[1]   The government dismissed the other underlying counts in 10-CR-147.

family in connection with the extortion. PSR ¶ 45. Bank records obtained from financial institutions since 2010 corroborate these payments. Id.

In 2020, members of the Colombo crime family expanded the demands on John Doe #1 and sought to (1) force the Labor Union's management to make decisions that benefitted the Colombo crime family, including the hiring and employment Co-Conspirator #1 as the assistant administrator to the Health Fund; (2) manipulate the selection of the Health Fund's vendors in order to have the Health Fund contract with entities and individuals associated with the Colombo crime family; and (3) divert more than $10,000 per month from the Health Fund's assets to the defendants and their co-conspirators. PSR ¶¶ 46, 54-61. Over the course of the next several months, the investigation revealed that the members of the Colombo crime family sought to use their control over the Labor Union to replace the Health Fund's vendors and Union's legal counsel with entities beholden to the Colombo crime family and its associates. PSR ¶ 60. Those entities would then pay a monthly fee, or "kickback," to the crime family. Id.

On October 13, 2020, early in the government's investigation, Vincent Ricciardo and Uvino discussed seeking Persico's counsel in connection with the Colombo crime family's bid to infiltrate the Union, in a judicially intercepted phone call. PSR ¶ 51. Frustrated by decisions made by boss Russo and consigliere DiMatteo (and thus indicating that Persico's influence over the family and its members), Vincent Ricciardo told Uvino, "I mean ah, I'm gonna hafta go a different route, I dunno Michael," Uvino suggested that they go meet Persico ("Do you want to take a ride tomorrow to let the ah, the guy in ah, in the body shop, in ah, Staten Island look at your car"), and used coded language to disguise the purpose of the meeting.

The following month, on November 19, 2020, the high-ranking members of the Colombo crime family met at a restaurant in Brooklyn, to discuss, among other things, their efforts to drain money from the Union. PSR ¶ 57.[2] Following these meetings, Ferrara was put in charge of supervising the scheme.

Thereafter, Vincent Ricciardo regularly updated Ferrara on the scheme's progress. In turn, Ferrara informed Persico. Id. ¶ 62. For instance, on February 3, 2021, Vincent Ricciardo convinced Ferrara to urgently meet with Co-Conspirator #1, who was not a member of the crime family, the following day to discuss the illegal extortion of the Labor Union. Id. Shortly after agreeing to meet Co-Conspirator #1, Ferrara called Persico, who agreed to meet Ferrara at a local restaurant in 15 minutes to "see what's going on." Id.

Law enforcement observed the same pattern on March 16, 2021. Ferrara agreed to meet Vincent Ricciardo on March 16, 2021, at a coffee shop in the Gravesend neighborhood of Brooklyn on March 17, 2021. PSR ¶ 70. Based on information provided by Co-Conspirator #1, Ricciardo provided Ferrara the Labor Union's meeting minutes, which showed that a Union consultant would receive a $600,000 payment should his contract be canceled for any reason— which Co-Conspirator #1 will testify that Ricciardo believed would cut into the Colombo crime family's profits. Less than two hours later, Ferrara called Persico and told him, "I'm coming to

---

[2] The meeting is described correctly in the PSR ¶ 57 but the date was incorrect. The date of this meeting was November 19, 2020.

see you in a little while, um, and bring you [UI] something." According to surveillance records, Ferrara met DiMatteo at Persico's autobody shop in Staten Island and the men remained inside for approximately 40 minutes.

During the next several weeks, Vincent Ricciardo, Russo, Persico and other members of the crime family variously met to discuss the ongoing issues with their infiltration of the Labor Union, specifically the perceived roadblocks that to the crime family's ability to target the Union and the Health Fund. For instance, on March 24, 2021, Vincent Ricciardo traveled to boss Russo's home — a meeting which he later relayed in an intercepted call was to discuss the extortion of the Labor Union. Five days later, on March 29, 2021, Persico told Ferrara, in an intercepted call, that Persico was "actually going to take a ride to Long Island real quick to see my brother," i.e., Carmine Persico (a previously convicted member of the Colombo crime family), and then law enforcement observed them visit boss Russo, a visit confirmed by GPS data and law enforcement surveillance of Persico's vehicle. PSR ¶ 74.

On April 1, 2021, Vincent Ricciardo and Uvino traveled to Persico's autobody business to discuss the situation with the Labor Union. Id. Law enforcement surveillance observed several individuals enter the business: first Persico, then Ricciardo and Uvino, who had arrived together in Uvino's vehicle, and finally Ferrara and another individual.[3] Immediately following this meeting, Vincent Ricciardo met with Co-Conspirator #1, and two days later, Ricciardo and Co-Conspirator #1 traveled to Florida to meet with co-defendant Albert Alimena to discuss the Union and the Health Fund.

After meeting with Ricciardo and Uvino, Persico continued to exert his influence over the scheme. For example, on April 13, 2021, at approximately 12:05 p.m., Co-Conspirator #1 drove Vincent Ricciardo to meet with senior members of the Colombo crime family at a garage located in Gravesend section of Brooklyn. PSR ¶ 76. After the meeting, Vincent Ricciardo told Co-Conspirator #1 that Castellazzo, the underboss of the Colombo crime family, would now be overseeing the scheme. Co-Conspirator #1 asked whether "Teddy in Staten Island" was involved, and Vincent Ricciardo explained "this guy," while making a hand signal for the letter "T," which Co-Conspirator #1 understood was Ricciardo's code for Persico, "gave it to this guy," who Ricciardo had earlier pointed out to Co-Conspirator #1. Vincent Ricciardo also relayed the same message to Co-Conspirator #1 on April 20, 2021, when he reiterated, "this guy," once again forming a letter "T" with his hands to indicate Persico, "dumped it on him," meaning Castellazzo, and "said whatever decisions you make."

On June 21, 2021, while discussing the Labor Union, Vincent Ricciardo assured Co-Conspirator #1, in a consensually recorded conversation, that the senior leadership of the

---

[3] Several weeks later, in a conversation consensually recorded by Co-Conspirator #1, Vincent Ricciardo confirmed to co-defendant Thomas Costa that he and Uvino had visited Persico at his "body shop in Staten Island" in the month to discuss the infiltration of the Labor Union. Vincent Ricciardo further explained that his visit to Persico caused the "other top guys" to yell at him for making an end run around boss Russo, further illustrating Persico's influence and power as a "top" member within the crime family. PSR ¶ 77.

5

Colombo crime family was supportive of their scheme to steal Union funds and this support would continue when Persico and his "new regime" led the crime family:

> V. RICCIARDO: Of course they're gonna honor it. You think they don't know? They know, Teddy knows, he knows, [Colombo Member-2's first name] knows, he knows, what's the matter with you? You think I just talk to these fucking idiots in Brooklyn? It's got nothing to do with you.

Uvino provided similar assurances of Persico's support for the scheme to Co-Conspirator #1, in a consensually recorded conversation, on July 20, 2021. Uvino explained why — Persico just wants "a few dollars." Uvino told Co-Conspirator #1 that Persico will not pose a problem because Persico would not collect more than his cut, explaining Persico is "not selfish" or "greedy" and won't claim he's "entitled" to more money.

> CC#1: And he's all okay with everything we're doing?
>
> UVINO: Everything. I told him everything's running smooth. No problem, he says do whatever youse have to do. He don't care about nothing, he just wants to go out, here's a guy, once he gets a few dollars, he just wants to go out, have a good time, the guy spent 30 fucking years in jail already, he's only 57, he's just about, you know what, do the right thing with me, ah, and I'm good with it, you know, he's not selfish, he's not gonna be greedy, he's not gonna say I'm entitled to ah-

Later in the conversation, Uvino reiterated that once the Colombo crime family wormed its way inside the Union, the money will just "keep[] rolling." According to Uvino, Persico responded, "youse know what you have to do, you know how it has to be done."

> UVINO: Well listen, that's what I told, you know, I told Teddy, once we're in there, I says, then once everything's set, then once it starts rolling it just keeps rolling, but it's gotta get set first, he's like no problem youse know what you are doing, he's like youse know what you have to do, you know how it has to be done, he's goes I dunno, I said no problem, I'm just keeping youse up to date, so, that's why, he's, the only guy with a problem is the problem is the big guy because he's a fucking brokester.

Persico had already received a portion of one payment purportedly from a consultant to the Health Fund (the FBI actually provided payment). In June 2021, at law enforcement's direction, Co-Conspirator #1 delivered an envelope containing a cash payment of $12,000 to Vincent Ricciardo and informed him that the money was from a consultant to the Health Fund who said: "I don't want anything to happen to my wife and brother." PSR ¶ 90.

Vincent Ricciardo notified DiMatteo, who then discussed accepting the payment with the senior members of the crime family. Id. On June 29, 2021, in a Franklin Square parking lot, DiMatteo collected the money from Vincent Ricciardo and subsequently traveled to the Brooklyn garage to meet with other members of the crime family. Id. Persico received a $3,000 payment — the same amount that boss Andrew Russo received from the payment they believed to be extortionate.

II.     Procedural History

A grand jury in this District returned an indictment against Persico and others on September 8, 2021, charging, among other crimes, racketeering, in violation of 18 U.S.C. § 1962(c). On September 14, 2021, Persico was arrested. He was arraigned before the Honorable Taryn A. Merkl, United States Magistrate Judge, who ordered his pretrial detention. Twice, Persico moved for bail and was denied. Since his arrest, he has been incarcerated at the Metropolitan Detention Center.

On April 13, 2022, a grand jury returned a 21-count superseding indictment, which is the operative charging document. In the Superseding Indictment, Persico is charged with the following crimes: (1) racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); (2) Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Two); (3) Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Three); (4) Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Four); (5) attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); (6) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Thirteen); (7) conspiracy to steal and embezzle health care benefit funds, in violation of 18 U.S.C. §§ 371, 664 and 669(a) (Count Fourteen); (8) health care fraud conspiracy, in violation of 18 U.S.C. §§ 1349 and 1347 (Count Fifteen); (9) attempted health care fraud, in violation of 18 U.S.C. § 1347 (Count Sixteen), (10) concealing material information from the U.S. Probation Office, in violation of 18 U.S.C. § 1001(a)(1) (Count Seventeen); and (11) making false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count Eighteen). In addition, Persico was charged, at the time the initial Indictment was returned in September 2021, with 15 violations of supervised release stemming from the same criminal schemes, as well as for associating with other members of the Colombo crime family.

On July 12, 2023, Persico pleaded guilty, pursuant to a plea agreement with the government, to Count One of the Superseding Indictment. As part of the plea agreement, Persico admitted to the conduct alleged in Racketeering Acts One and Six of the Superseding Indictment, to wit: extortion conspiracy of John Doe #1 and money laundering conspiracy, respectively. Persico stipulated to the government's estimated Guidelines calculation of 63 to 78 months and agreed not to appeal the sentence or conviction should the Court impose a term of 105 months or below. The government agreed not to seek a sentence above 71 months of imprisonment and at sentencing to move to dismiss the 15 violations of supervised release.

III.  Guidelines Calculation

    The government submits that the Guidelines calculation as reflected in the PSR is correct:

Count One: Racketeering

Racketeering Act 1: Extortion Conspiracy

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2B3.2(a)) | 18 |
| Plus: Offense Involved Threat of Bodily Injury (U.S.S.G. § 2B3.2(b)(1)) | +2 |
| Plus: Loss Greater Than $95,000 (U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C)) | +2 |
| Total: | **22** |

Racketeering Act 6: Money Laundering Conspiracy

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2)) | 6 |
| Plus: Intended Loss More Than $150,000 (U.S.S.G. § 2B1.1(b)(1)(F)) | +10 |
| Total: | **16** |

Multiple Racketeering Act Analysis

| | | |
|---|---:|---:|
| Highest Adjusted Offense Level | | 22 |
| Units: | | |
|     Racketeering Act 1 (U.S.S.G. § 3D1.4(a)) | 1 | |
|     Racketeering Act 6 (U.S.S.G. § 3D1.4(a)) | ½ | |
|     Total Units | 1 ½ | |
| Levels Added (U.S.S.G. § 3D1.4): | | +1 |
| Plus: Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | | +3 |
| Less: Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), (b)) | | -3 |
| Total: | | **23** |

In addition, the parties agree that an additional two-level departure is warranted for the case's global resolution by July 15, 2023. PSR ¶ 272; U.S.S.G. § 5K2.0. Persico is in Criminal History Category IV. With an adjusted offense level of 23 and Criminal History IV, the applicable

8

Guidelines range of imprisonment is 70 to 87 months (CHC IV x 23), and if the Court accepts the additional, two-level departure for global resolution, the range is 57 to 71 months (CHC IV x 21).

The calculation in PSR and the calculation in the plea agreement differs in two respects. In the plea agreement, (1) the government estimated that Persico was in Criminal History Category V (not Category IV) and (2) the government estimated that Persico received a two-point, not a three-point, leadership enhancement. As to his criminal history category, the government believed Persico qualified as Criminal History Category V, because it awarded his 1987 conviction three points, believing he had violated his probation in 2007 and been incarcerated for that violation. To date, the government has been unable to locate any records demonstrating Persico's incarceration for the 2007 violation. Therefore, Persico's release date of April 2004 does not fall within the 15-year look-back period of his involvement in the crimes of conviction, and is not awarded any points. See U.S.S.G. § 4A1.2(k)(2) (providing that fifteen-year period for counting a criminal conviction begins on "the date of last release from incarceration on such sentence," including incarceration resulting from parole violations tied to underlying offense). As to the leadership enhancement, the upon further review, the government believes Probation's view of the applicability of U.S.S.G. § 3B1.1(b) here is correct. Notably, the Guidelines calculation in the PSR is lower than the calculation in parties' plea agreement, in which the defendant stipulated to a Guidelines range of 63 to 78 months' imprisonment (a range which include the three-point reduction for acceptance of responsibility and the two-point reduction for global resolution).

IV.  The Appropriate Sentence

   A.  Applicable Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. In so doing, the court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." Id. at 590.

The Supreme Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564

F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct; [and]

    (C)    to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

### B. Argument

The government respectfully submits that a sentence at the high end of the range of 57 to 71 months' imprisonment (the range if the Court accounts for the global resolution departure) is appropriate in view of the serious, long-running nature of the scheme to siphon funds from the Labor Union, Persico's lengthy criminal history and repeat recidivism, his leadership role in a violent organized crime family, the need to protect the public, and the need for deterrence.

#### 1. Nature and Circumstances of the Offense

The serious nature of the criminal conduct, as well as its nexus to a violent organized crime enterprise, warrants a significant term of imprisonment. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). For years, members of the Colombo crime family used the crime family's violent reputation to force John Doe #1, a senior official at the Labor Union and Health Fund, to make illegal payments each month, placing him in fear of what would happen if he refused. In 2020, members of the Colombo crime family sought to use their control over the Labor Union to implement a money-laundering scheme, where they would receive monthly kickbacks from Union vendors aligned with the crime family. These crimes were serious on account of their nature (which included threats backed by the promise of violence and the theft of Union funds) and the length and repetitiveness of the conduct, especially in view of the backdrop of organized crime activity.

Persico played an important role in the extortion and money-laundering scheme. Persico was the heir-apparent to the Colombo crime family, and as the organization's next leader,

10

it was vital to have Persico's support before the crime family forced the Union and Fund to sign lengthy contracts with corrupt vendors. Persico had influence over other members, especially Vincent Ricciardo and Michael Uvino (the two defendants who had the most contact with John Doe #1). And there is no question that Persico — unreservedly — gave his support. Ricciardo and Uvino repeatedly discussed, in intercepted calls and consensually recorded conversations, Persico's approval for the scheme, on October 13, 2020, February 22, 2021, April 1, 2021, April 20, 2021, June 21, 2021, July 20, 2021, among others. Persico also ensured that the scheme was directly supervised by Castellazzo, the Colombo crime family's underboss and second most powerful member. Persico's powerful role is also illustrated by the portion of funding that Persico received from an illegal payment allegedly provided to the crime family in June 2021. From the $12,000 payment, Persico received $3,000 — the same amount as then-boss Andrew Russo.

Despite Persico's powerful influence among the members of the crime family and his admitted involvement in the extortion and scheme to launder Union funds, Persico claims he "was only passively involved." Def. Sentencing Memorandum dated November 24, 2023 at 7 ("Def. Mem."), ECF Dkt. No. 572. Leaders are not passive participants. Persico did not make unannounced visits to John Doe #1 or attend meetings with corrupt vendors because his leadership position earned him the privilege of having others make threats and collect payment. Persico used his status to mediate issues within the Colombo crime family to facilitate the money-laundering scheme. Those actions do not make Persico's involvement in the scheme "passive," to the contrary, they further illustrate Persico's power, rank and influence within the organization. Persico's high-ranking position within the Colombo crime family should not permit him to claim some lesser responsibility for the extortion-money laundering scheme — a plan he knew about, encouraged and intended to directly benefit.

    2.    <u>Defendant's History and Characteristics</u>

Perhaps more than any other factor, Persico's history and characteristics confirm that a significant term of imprisonment is warranted here. See 18 U.S.C. § 3553(a)(1). Persico has been incarcerated for most of his adult life for crimes including racketeering, conspiracy to commit murder, weapons possession, extortionate collection of credit, attempted grand larceny, receiving stolen property, and criminal sale of controlled substances. Many of these crimes were committed to further the aims of the Colombo crime family. Indeed, Persico's own documented membership in the crime family goes back more than three decades, when Persico ordered members of his own crew to kill a rival member of the Colombo crime family at his grandmother's wake. His involvement with the Colombo crime family continued upon his release from prison in 2004 (weapons possession and extortionate collection of credit), again in 2008 (racketeering conspiracy and wire fraud) and most recently, in 2020 (extortion and money laundering conspiracy). For instance, Persico later acknowledged that upon his release in 2004, he returned to the Colombo crime family that very month. Following his 2008 release, Persico pleaded guilty to violating the terms of Court supervision beginning on June 4, 2008—his date of his release from custody. Within months of his release in May 2020, Persico not only returned to the Colombo crime family but was selected to be its next leader.

To the extent Persico argues in his sentencing submission that he sought to follow the conditions of supervised release before his arrest in this case (Def. Mem. at 9-10, 15), such a claim is laughable. In fact, the evidence shows dozens of phone calls and meetings with known

members of organized crime—a fact Persico himself readily admitted in a monitored call from the Metropolitan Detention Center ("MDC") with one of the proposed suretors in this case. On September 17, 2021, Persico explained to Caller-1, "I'm definitely dead on the violation and lying to the officer. I can live with that, it is what it is. Give me the two years, I'll do it right now." In another example, during the 30 days law enforcement agents monitored Persico's cell phone in 2021, agents intercepted approximately 25 calls between known and suspected members of organized crime (TP #36, #37, #47, #111, #121, #208, #210, #239, #246, #283, #285, #294, #303, #316, #317, #340, #368, #390, #401, #455, #468, #479, #494, #499, #500, and #505), and several of these calls were made to arrange in-person meetings with Persico.

This prior criminal conduct is significant for two reasons: First, these lengthy sentences did not deter Persico from committing additional crimes. To the contrary, Persico not only continued to associate with members of organized crime, but he sought to ascend through the ranks of the Colombo crime family to become its next leader. Second, this criminal history and decades-long, undeterred association with a criminal enterprise demonstrates that Persico has sworn a lifelong commitment to the Colombo crime family — an organization that was led for decades by Persico's blood family members, including his uncle Carmine Persico and his uncle Andrew Russo. Even the other members of the Colombo crime family recognize Persico's commitment to the criminal organization, and before his arrest, had determined he would become the next boss of the crime family. While Persico claims his future role is irrelevant here, see Def. Mem. at 6, this leadership role is a factor under his history and characteristics that the Court should consider in determining the appropriate sentence. It demonstrates his lifelong allegiance to Colombo crime family.

### 3. Affording Deterrence and Protecting the Public

Given Persico's commitment to the Colombo crime family and his repeated return to criminal activity, a Guidelines sentence is also necessary to afford adequate deterrence to criminal conduct and to protect the public. 18 U.S.C. § 3553(a)(2)(B), (C).

As to specific deterrence concerns, Persico's history makes clear that despite his promises to reform, he has quickly and consistently resumed his ties to the Colombo crime family following his release from prison. The Court should not turn a blind eye to the defendant's longstanding disrespect for the law and its consequences. Indeed, while Persico argues this time will be different, he fails to address the repeated, documented instances in which he has violated past terms of supervised with new criminal conduct. That Persico committed the instant crimes after serving two prior federal sentences for crimes committed with members of the Colombo crime family demonstrates that incapacitation is necessary to serve as a specific deterrent and to protect the community from the defendant's life of crime. Indeed, as a member of the Colombo crime family, the defendant has sworn allegiance to it for life—a factor that significantly undercuts Persico's argument that he will not recidivate due to his relationships. Persico is a committed leader of a dangerous and violent criminal organization. His prior incarcerations have not changed that outcome, nor is it likely that this prosecution will. At bottom, his detention and future imprisonment here are about incapacitation and prevention of all-but-certain future criminal activity by the defendant for the benefit of the crime family.

12

General deterrence also warrants a significant sentence. Persico's crimes involved the criminal control of a Labor Union by the Colombo crime family, a pernicious criminal organization whose substantial influence in the labor industry and the New York City community more generally persists. Persico played a vital role in a criminal conspiracy that sought to steal hundreds of thousands of dollars from Union members and their employers, all while enriching the Mafia. Indeed, a significant sentence is important to acting as a general deterrent to others who, like Persico, would seek to enrich themselves and their organization at the expense of Union members through widespread corruption.

4. Promoting Respect for the Law and Providing Just Punishment

The sentence must also promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). A sentence of imprisonment at the high end of the Guidelines range of 57 to 71 months' imprisonment would send the message that leaders within organized crime are held accountable for the actions they oversee, encourage and profit from. The law applies equally to the individual who delivered the threats as it does to the individual who authorized and directed it.

5. Persico's Arguments for a Below-Guidelines Sentence Are Unpersuasive

Persico argues that the Court should award him a below-Guidelines sentence because of his employment history (Def. Mem. at 20), his family ties and community service (id. at 21-23, 29-30), and the conditions within the Metropolitan Detention Center during his pretrial detention (id. 23-28). Given Persico's history and conduct in this case, none of these factors weigh in favor of a below-Guidelines sentence.

As to his employment history, Persico fails to mention — although it is obvious from his criminal history — that during brief time periods when he was not incarcerated and was employed, he was also working for the Colombo crime family committing new crimes. As relevant here, Persico used his place of business to conduct meetings to further this extortion and money laundering scheme. For example, law enforcement surveillance captured members of the Colombo crime family going to Persico's autobody shop when Persico's vehicle was parked outside, including on November 17, 2020 (DiMatteo and Ferrara), February 19, 2021 (Ferrara), March 16, 2021 (DiMatteo and Ferrara), and April 1, 2021 (Vincent Ricciardo, Ferrara, and Michael Uvino). The facts in the case make clear that Persico's most stable and enduring job has been his position working for the Colombo crime family.

Persico asks the Court to deviate below the Guidelines because of the assistance his family requires and his community service. This is an unfortunate reality for many defendants. All too often, a defendant's family struggles with the collateral consequences of the defendant's actions and the resulting period of incarceration. As such, while the government recognizes that the defendant's incarceration may have an adverse impact on his defendant's family members, this does not materially distinguish him from many or most of the other defendants sentenced in this District. Following Persico's release from custody in 2020, his family's needs did not dissuade him from resuming his role within the Colombo crime family and in agreeing to additional leadership responsibilities.

Persico also seeks a below-Guidelines sentence based on the conditions at MDC Brooklyn during his pretrial incarceration and his lack of medical care.[4] While the Court has wide latitude to consider and grant variances, the majority of the decisions cited in the defendant's submission concerning the COVID-19 pandemic concern pretrial confinement during the peak of the COVID-19 pandemic in 2020 or early 2021. Persico was detained at the MDC Brooklyn beginning in September 2021. ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████

IV. Conclusion

For these reasons, the government respectfully requests that the Court impose a sentence at the high end of the 57-to 71-month range of imprisonment, a term of three years' supervised release and award restitution to John Doe #1 in the amount of $280,890.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Devon Lash
Michael W. Gibaldi
Andrew D. Reich
Assistant United States Attorneys
(718) 254-7000

cc: Clerk of Court (HG) (by ECF and Email)
    Joseph R. Corozzo, Esq. and Angela Lipsman, Esq. (by ECF and Email)
    United States Probation Officer Frank Nikolaidis (by E-Mail)

---

[4] The government respectfully requests that a redacted version of this letter be filed publicly, sealing only the portions of this response that may reveal health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") that has not otherwise been disclosed in the defendant's public filings. See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common- law right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).